***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Berger. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission has rewritten the Opinion and Award but affirms the holding of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On or about March 16, 1999, plaintiff filed a Form 18 alleging he had sustained an "illness/injury" at an "undetermined" time during his employment with defendant-employer. Plaintiff alleges "illness/injury" as a result of exposure to "toxic vapors and other substances to be determined."
2. Defendant filed a Form 61 on or about April 20, 1999 denying plaintiff's claim for compensation.
3. On or about July 17, 2000, plaintiff filed a Form 33 requesting a hearing before the Industrial Commission identifying an "unknown" date of alleged injury, and claiming entitlement to "unknown" workers' compensation benefits.
4. During plaintiff's period of employment, defendant-employer employed three or more employees and was subject to the provisions of the North Carolina Workers' Compensation Act. During plaintiff's period of employment, defendant-employer was a duly qualified self-insured and RSKCO was the administering agent.
5. Plaintiff's average weekly wage with defendant-employer was $668.00, yielding a compensation rate of $445.33.
6. Plaintiff is no longer an employee of defendant-employer.
7. All parties are properly designated and there is no question of non-joinder or mis-joinder of parties.
8. The following exhibits were entered into evidence by the parties:
a. Pre-trial Agreement (exhibit S1)
b. Industrial Commission Forms (exhibit S2)
c. Responses to Interrogatories (exhibit S3)
d. Medical Records (exhibit S4)
e. Can of Foam Fast 74 (plaintiff's exhibit 1)
f. 8/10/94 Medical History of plaintiff (plaintiff's exhibit 2)
g. MSDS Foam Fast 74 (plaintiff's exhibit 3)
h. Packet of MSDS Sheets (plaintiff's exhibit 4-5)
i. Letter to Ms. Young (plaintiff's exhibit 6)
j. Chemical air sampling (defendant's exhibit 1)
k. Industrial Hygiene Survey Report (defendant's exhibit 2)
 ***********
Based upon all of the competent evidence of record herein, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 47 year old male. Plaintiff regularly smoked cigarettes. He began working for defendant-employer in August of 1994 as an upholsterer and worked there until April 18, 2000. For most of plaintiff's life he has been employed as an upholstery worker.
2. Plaintiff assembled chairs, putting on legs and arms with either glue or screws. One of the glues that plaintiff used in the assembly process was 3M Super 74 Foam Fast. Plaintiff testified that he used Foam Fast 74 on a regular basis from August 1994 to March 1999. Plaintiff testified that he used Foam Fast 74 mostly on the Willow chairs and that he made more Willow chairs than any other employee. Co-workers acknowledged that plaintiff was one of the fastest workers in the inside upholstery department. No protective type of equipment was provided by defendant-employer such as gloves, respiratory protection or protective clothing.
3. Plaintiff began to experience medical problems soon after beginning employment with defendant-employer, including upper respiratory and skin problems, eye irritation and blurred vision, sore throat, burning of the skin, breathing problems, extreme fatigue, inability to concentrate, depression, and irritability.
4. Plaintiff testified that he did not make the Willow chairs every day and that he used other adhesives on the chairs, in addition to screws. The Foam Fast 74 was used only on a few other types of chairs. Defendant-employer did not establish guidelines on how much or which type of adhesive to use. Each employee determined which adhesive to use for the chair that he was assembling. No evidence was presented that plaintiff was exposed to more Foam Fast 74 than any other employee.
5. The Material Safety Data Sheets (MSDS) for 3M Foam Fast Adhesive supplied by 3M warn of symptoms very similar to those plaintiff experienced. The MSDS suggest dangers from not only inhalation, but also absorption through the skin.
6. Witnesses described how the glue coated employees' hands and arms, and that the employees learned that if they coated their body with lotion, the glue was easier to remove at the end of the day.
7. In 1998 plaintiff began seeing Dr. Greg Warren at Happy Valley Medical Center for complaints of sinus and allergy problems. Prior to working for defendant-employer, plaintiff had a history of acute sinus problems.
8. From May 1997 through February 1998, plaintiff was seen and treated by Dr. James Darsie, an ear, nose and throat specialist. Also during this period Dr. Warren referred plaintiff to Dr. Robert Ross of Asthma and Allergy Associates in Winston-Salem. These physicians were unable to provide a specific diagnosis.
9. Plaintiff sought treatment from Dr. Joseph T. Inglefield, III, who is a specialist in the area of allergy and immunology. Dr. Inglefield first saw plaintiff on November 17, 1998, upon referral from Dr. Warren. Dr. Inglefield ran a series of tests, but was unable to diagnose a cause of plaintiff's problems. Dr. Inglefield stated in his deposition that he found plaintiff's symptomatology not typical and felt plaintiff had increased sensitivity. Dr. Inglefield felt that plaintiff's condition was likely a workplace problem, although he was not able to isolate an exact cause. Dr. Inglefield used the MSDS sheets from products that plaintiff used on a regular basis to evaluate possible causes. Dr. Inglefield last saw plaintiff in December of 1998, referring him to Dr. Marc Guerra, a family physician with a concentration in occupational medicine.
10. Dr. Guerra first saw plaintiff on January 26, 1999 and continued at the time of the Deputy Commissioner hearing to treat plaintiff as his primary physician. Dr. Guerra testified that he practices in an area where much of the population is in the furniture business. He testified that he commonly sees the types of problems that plaintiff has and is very familiar with reviewing MSDS sheets.
11. Plaintiff reported to Dr. Guerra a "symptom constellation," including breathing difficulties, congestion, shortness of breath, skin irritation and rashes. Dr. Guerra felt that plaintiff's symptoms were consistent with developing acute respiratory problems related to exposure to irritants at work. Dr. Guerra instructed plaintiff to stop smoking and to wear appropriate protection at work and prescribed bronchial dilating agents and antibiotics.
12. Dr. Guerra stated his opinion to a medical certainty that plaintiff's physical conditions were due to exposure to solvents in the workplace. He stated in his deposition that he felt plaintiff is unemployable due to his medical problems.
13. Defendant-employer's physician, Dr. Eric Hart, saw plaintiff only once on March 15, 1999 and diagnosed chemical exposure. At that time plaintiff had worked for defendant-employer for three years. Plaintiff complained of symptoms of skin irritation, headaches, dizziness and memory loss. Plaintiff informed Dr. Hart that he felt the Foam Fast product was the source of his problems. Dr. Hart referred plaintiff to Dr. Dale Menard, a neurologist.
14. Dr. Menard first saw plaintiff on April 9, 1999 and indicated he concurred with the diagnosis of chemical exposure. He suggested that a toxicologist could shed some light on the problem and referred plaintiff to Dr. Carole Epling at Duke University Medical Center. Dr. Epling indicated that plaintiff's exposure was shorter than that typically associated with such adverse health effects.
15. Dr. Donald E. Schmechel evaluated plaintiff on September 30, 1999 for skin problems, allergy, airway problems, mental concentration problems and a sleep disorder. Dr. Schmechel is affiliated with Duke University Medical Center and is a leading authority and expert in the field of neurology with a sub-specialty of workplace chemical exposures. He did extensive testing to determine the source of plaintiff's problems. Dr. Schmechel found autonomic neuropathy and dysfunction and believed that plaintiff was indeed medically ill. Dr. Schmechel stated in his deposition that he felt plaintiff was unemployable due to his medical problems and that plaintiff's overall medical disability was due to chemical exposures.
16. Dr. Marsha Ford was employed by defendant-employer to review different chemicals to which upholstery workers were exposed in their employment at defendant-employer. Dr. Ford is the Director of Carolinas Poison Center, which is the state poison center, and is the Assistant Chairman and Director of Toxicology for the Department of Emergency Medicine at UNC-CH. Dr. Ford stated that the ingredients in Foam Fast 74 glue include dimethyl ether, pentane, acetone, naphthol spirits and non-volatile components (trade secret). She assessed the potential for these components to cause any of plaintiff's problems using literature searches, MSDS sheets, accepted standard toxicology and occupational medicine references. Dr. Ford concluded that the dermal exposure to acetone, pentane and naphthol spirits could have contributed to plaintiff's skin disorder and that acute exposure to acetone and dimethyl ether could have produced mild acute neurobehavioral effects such as headache, fatigue and light headedness. Dr. Ford further concluded that plaintiff's exposure did not cause or contribute to the development of any of plaintiff's other medical problems. She did not feel that Foam Fast was an inherently dangerous product. Dr. Ford stated that she felt that plaintiff was more sensitive to exposure than the average person, and that with some sensitivities, exposure over time made the symptoms become more severe, using poison ivy exposure as an example.
17. R. Curtis Duncan is an industrial hygienist with Environmental Investigation and has been employed in this field since 1980. He was employed by defendant-employer to do personal and area air monitoring in the upholstery department and to determine typical worker exposure to formaldehyde, ammonia, total dust, and ethyl alcohol. Mr. Duncan went to the plant on May 20, 1999 and did sample testing in the building where plaintiff worked. Mr. Duncan concluded that all results were within OSHA and ACGIH threshold limit values. He noted that several of the limits were actually below these limits.
18. Danny Willis testified at the hearing before the Deputy Commissioner that he had worked with plaintiff and that he had used as much Foam Fast 74 as plaintiff did. He also stated that he continues to use Foam Fast 74 in his job, although he no longer works for defendant-employer. At the time of the hearing, Mr. Willis worked in a confined and less well-ventilated area.
19. Vicki Young, Human Resources Manager and Safety Director of defendant-employer, testified that in her ten years of employment with defendant-employer no other upholster complained of problems from using Foam Fast 74 and no other person filed a workers' compensation claim alleging a problem from Foam Fast 74.
20. Paul McGinnis was a supervisor over the upholstery department at defendant-employer for the past sixteen years and testified that defendant-employer made 150-200 styles of chairs while plaintiff worked there. Mr. McGinnis testified that the Willow chairs were made every week, usually on Thursday and Friday. Plaintiff built 3-4 chairs of the total of approximately 30-40 Willow chairs that were built each week.
21. Mr. McGinnis testified that plaintiff did not work in a spray booth and that the spray booth was located approximately thirty yards from where plaintiff worked. Plaintiff worked in a huge, open room with four air conditioning units, fans and vents above his work area. Mr. McGinnis testified that no other employees complained of medical problems of any kind from using Foam Fast 74.
22. On November 10, 2000 Dr. Guerra provided a note to defendant-employer, stating that plaintiff was out of work due to encephalopathy. Because plaintiff's six month medical leave of absence had expired, plaintiff was terminated five days later.
23. The greater weight of the expert medical evidence of record fails to support a finding that plaintiff's exposure to Foam Fast 74 or any other adhesive or chemical while employed with defendant-employer placed plaintiff at an increased risk of contracting and/or aggravating a chronic pulmonary disease, toxic encephalopathy, vestibular dysfunction, coronary heart disease, skin lesions, or sleep disorder as compared to the public not so equally exposed.
24. On May 14, 2001 plaintiff served two subpoenas on defendant-employer's personnel manager/safety compliance officer. The subpoenas duces tecum were served one week before the Deputy Commissioner hearing and did not comply with Industrial Commission discovery rules. The first subpoena requested a complete copy of all Material Data Safety Sheets for products used by defendant-employer during plaintiff's employment. The second subpoena requested copies of not only plaintiff's personnel file, related documents, and medical records, but also those of any employees who might testify on behalf of defendant-employer and all health records for every employee who worked during plaintiff's period of employment. The Deputy Commissioner properly granted defendant's motion to quash the subpoenas duces tecum.
 ***********
Based upon the foregoing stipulations and findings of fact the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) it must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) it cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468;256 S.E.2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co.,79 N.C. App. 324, 331, 339 S.E.2d 490, 494 (1986).
2. Plaintiff failed to prove his symptoms are due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment. Although there was medical testimony causally relating plaintiff's medical condition to his employment, no expert medical testimony was offered to show that plaintiff was at an increased risk of contracting the various conditions because of his employment with defendant-employer. Norris vs. Drexel HeritageFurnishings, Inc., 139 N.C. App. 620, 534 S.E.2d 259 (2000). Therefore, there is insufficient expert medical evidence of record to support a finding that plaintiff's exposure to Foam Fast 74 or any other adhesives or chemicals while employed with defendant-employer placed plaintiff at an increased risk of contracting and/or aggravating a chronic pulmonary disease, toxic encephalopathy, vestibular dysfunction, coronary heart disease, skin lesions, or sleep disorder as compared to the public not so equally exposed. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff is, therefore, not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act. Id.
4. Deputy Commissioner Berger did not error in quashing the subpoenasduces tecum served upon defendant-employer on May 14, 2001. N.C. Gen. Stat. § 97-80(e).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim must be and is HEREBY DENIED.
2. Defendant shall pay expert witness fees in the amount of $250.00 to Dr. Hart, $450.00 to Dr. Ford, $400.00 to Dr. Inglefield, $220.00 to Dr. Guerra, $220.00 to Curtis Duncan and $550.00 to Dr. Schmechel, to the extent the same have not already been paid.
3. Each side shall pay its own costs.
This ___ day of January, 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
LKM/kjd