***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The appealing parties have shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. It is stipulated that at all times relevant to this claim, an employer-employee relationship existed between Anne Jenns, Ph.D. (hereafter "decedent") and North Carolina State University.
4. North Carolina State University and the State of North Carolina are self-insured. Key Risk Management is the adjusting company on this claim.
5. Plaintiffs submitted that decedent's average weekly wage, calculated on the basis of her annual salary, was $704.83, which yields a weekly compensation rate of $469.89. Defendant refused to stipulate to this average weekly wage, but did not produce a Form 22 Wage Statement or any other evidence of wages.
6. Decedent was diagnosed with brain cancer in February 1999, and died as a result of that cancer. She was specifically diagnosed with glioblastoma multiforme on October 29, 2000.
7. It is stipulated that defendant has paid no medical bills or disability benefits to or on behalf of decedent arising from her brain cancer.
8. The following exhibits were entered into evidence by plaintiffs at the hearing before the Deputy Commissioner:
(a) Plaintiffs' Exhibit Number 1 — job application
(b) Plaintiffs' Exhibit Number 2 — performance appraisal
(c) Plaintiffs' Exhibit Number 3 — Family Medical Leave request
(d) Plaintiffs' Exhibit Number 4 — hours worked
(e) Plaintiffs' Exhibit Number 6 — diagram of lab
(f) Plaintiffs' Exhibit Number 7 — safety plan
(g) Plaintiffs' Exhibit Number 8 — audit report
(h) Plaintiffs' Exhibit Number 9 — MSDS sheets
(i) Plaintiffs' Exhibit Number 10 — Memo August 31, 1999
(j) Plaintiffs' Exhibit Number 11 — Nichols transcript
(k) Plaintiffs' Exhibit Number 13 — newspaper articles
(l) Plaintiffs' Exhibit Number 14 — death certificate
(m) Plaintiffs' Exhibit Number 15 — emergency room records
(n) Plaintiffs' Exhibits Number 16-22 — photos
(o) Plaintiffs' Exhibit Number 24 — Mr. Hardy's resume.
8. The depositions and records of Dr. William Berry, Patrick W. Crockett, Ph.D., Andrew P. Mason, Ph.D., Francis Giesbrecht, Ph.D., and Wendy Nichols are a part of the evidence of record.
9. By Orders filed February 6, 2004, Marshall B. Hardy was appointed guardian ad litem of decedent's minor children, Elizabeth Hardy and William Hardy.
10. The issues before the Commission are whether decedent contracted an occupational disease in or about February 1999 in the course and scope of her employment with defendant, and, if so, to what benefits or compensation are her heirs entitled?
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACTS
1. From 1984 until October 29, 2000 decedent was employed by defendant as a plant pathologist and performed plant research in defendant's laboratory.
2. Decedent was diagnosed with glioblastoma multiforme, a brain tumor, in February 2000 and died on October 28, 2000. The cause of death listed on decedent's death certificate is a brain tumor.
3. Decedent and plaintiff Marshall Hardy were married on June 13, 1981 and remained married until decedent's death. The couple had two minor children, Elizabeth and William, who are plaintiffs herein. The widower and two children are presumed to have been wholly dependent upon decedent for support. Decedent was not survived by any other person who was either wholly or partially dependent upon her at the time of her death.
4. Decedent worked in defendant's plant pathology lab. Margaret Daub, Ph.D., supervised the lab from 1993 until the decedent's death in October 2000.
5. As a part of her job, decedent used small amounts of chemical solvents performing tests and experiments. More than 400 solvents and chemicals were stored in the lab where decedent worked. The chemicals and solvents that were routinely used in the lab included ethanol, methanol, acetone, chloroform, diethyl ether, formaldehyde, pentane, hexane, phenol and ethyl acetate. These chemicals were also used by other employees and students.
6. Wendy Nichols worked with decedent in the same laboratory as a research associate from 1991-1999. Ms. Nichols testified she worked in the lab with another graduate student, Rosie Perez. Ms. Perez was diagnosed within a year of beginning work in the lab with non-Hodgkin's lymphoma and died from that disease.
7. According to Ms. Nichols, there were regular problems in the lab with the ventilation system and changes in temperature which occurred the entire time she was employed by defendant. Ms. Nichols testified that quite a number of organic solvents were stored in the lab, and one could smell the chemicals before entering the room. Ms. Nichols stated that the lab's fume hood did not work properly. Defendant at one point posted a warning on the hood. The hood continued to be used and, when an experiment was performed, strong smells permeated throughout the lab.
8. Ms. Nichols testified that decedent's work area was located in the laboratory and that the solvent cabinet was located directly beside decedent's desk. When the cabinet doors were open, extreme odors were released into the lab. Ms. Nichols testified that the doors to the cabinet were frequently left open and that she was forced to leave the lab on numerous occasions because of extreme heat or chemical smells.
9. Dr. Daub testified that decedent began working for her in the fall of 1984 as a researcher, and upon completing her post-doctoral position moved to a state funded SPA position in 1989. Decedent's responsibilities included overseeing hourly employees, managing the chemical inventory and instructing undergraduate students in safety procedures, in addition to conducting research.
10. Most research conducted in the lab involved genetic engineering of plants for disease resistance. Dr. Daub described decedent as an excellent scientist, who was very careful, very accurate and unbiased. It was not unusual for decedent to wear a cotton mask when measuring chemicals or conducting experiments.
11. Dr. Daub testified that the chemical cabinet inventory consisted of eleven pages of chemicals that varied in quantity. She also testified that when a new safety plan was filed each year with the Environmental Health and Safety Agency, the old safety plan was discarded. Any changes were documented on the new plan, including additions of chemicals or changes in procedures.
12. Dr. Daub described some of the chemicals stored in the cabinet as very flammable, volatile, and toxic. Many of these chemicals were stored adjacent to decedent's desk. The lab workers could smell the chemicals when the door to the cabinet was open, but not when it was closed. Some chemicals were stored on top of the cabinet when the cabinet was full.
13. Dr. Daub testified after decedent was diagnosed with the brain tumor, the chemical cabinet was moved at Mr. Hardy's request.
14. According to Dr. Daub, some of the chemicals in the cabinet were regularly used and upon receipt were not labeled. The inventory list of chemicals was likewise not always updated. MSDS sheets were not available in the lab, but were available online.
15. The lab was an interior room and did not have exterior walls or windows. There were two exits to the lab. One doorway led directly into the hallway and was the main door used to enter and exit the lab. The other door remained locked.
16. Dr. Daub testified that there were temperature control issues in the lab, usually related to seasonal changes. She also testified that the fume hood did not work properly for over a year.
17. Dr. Daub is a botanist in plant pathologies, is not a chemist, and did not have specific knowledge of how some of the chemicals in the lab should be stored.
18. Marilyn Ehrenshaft, Ph.D., a plant pathologist, began working in the lab with decedent in June 1992. She stated that the lab in general was very smelly. Dr. Ehrenshaft also testified that the cabinet door was left open frequently, and that she and decedent complained about this situation in lab meetings. The smells emanating from the cabinet were unpleasant and very strong. Dr. Ehrenshaft stated that for certain chemicals, a more intense smell indicates a greater amount of exposure.
19. Mr. Hardy completed a study and wrote Analysis ofMedical/Epidemiological Studies on the Connection between Exposure toOrganic Solvents and Brain Cancer. Mr. Hardy's article is a mathematical study in which he used mathematical theories to evaluate the increased risk of decedent's contracting glioma from her work as a scientist. Because of Mr. Hardy's relationship to decedent and financial interest in the outcome of this case, his article is given little weight by the Commission.
20. Patrick Crockett, Ph.D., a research statistician, testified that he had problems with Mr. Hardy's bias and felt there were unscientific leaps made in the article. Dr. Crockett felt because there was no way to measure the particular chemicals and no way to measure whether decedent's exposure was substantial, the statistical analysis Mr. Hardy presented did not establish causation. Dr. Crockett felt there needed to be a measurement of the level of exposure to establish increased risk.
21. Francis Giesbrecht, Ph.D., a professor of statistics, felt Mr. Hardy used sound methods to perform his calculations and that his conclusions were conservative. Dr. Giesbrecht concluded, based upon Mr. Hardy's calculations, that the organic solvents to which decedent was exposed contributed to a higher rate of cancer. Dr. Giesbrecht did not believe Mr. Hardy's bias was a serious problem because it involved reviewing the work of other researchers and checking the numbers.
22. Andrew P. Mason, Ph.D., a forensic toxicologist, did not agree with Mr. Hardy's hypothesis that decedent's exposure through her employment contributed to the formation of her glioblastoma. Dr. Mason felt the main problems with Mr. Hardy's theory were no real documentation of exposure to a particular chemical and no information on the duration or concentration of that exposure. Dr. Mason testified that Mr. Hardy's article did not document evidence of respiratory irritations, did not investigate other possible causes of decedent's brain tumor, and failed to provide enough background data to be conclusive.
23. Dr. Mason found no relationship between decedent's work and the development of her glioblastoma multiforme. However, he also stated that the causal link between chemicals and brain cancer "is an area of ongoing contentious debate among various investigators and scientists who examine these questions. If one reads the literature, it becomes very, very clear. There is a large body of work or a large number of investigations currently ongoing, and I would say, that the final chapter has not been written."
24. The only medical doctor who testified in this case was Dr. William Berry, a board-certified specialist in oncology. Although decedent was primarily treated by Dr. Henry Freedman, a Duke Medical Center neuro-oncologist, Dr. Berry served as decedent's local physician in case of complications of her disease or therapy that required immediate treatment. Dr. Berry stated decedent had a form of cancer that is relatively rare. Dr. Berry expressed his opinion that decedent's lengthy exposure to solvents and chemicals located in the unvented cabinet next to decedent's work area was a significant contributing factor in the development of the brain tumor that eventually resulted in decedent's death. Dr. Berry further stated that based on his review of records and medical literature, decedent was at an increased risk from the environmental exposure. Although he admitted that "you can't really say specifically that this thing [chemical exposure] caused this cancer," he stated that there were "significant risks associated with the duration of exposure as . . . described . . . and that there would be considerable concern on my part that this exposure did play a role in the development of her glioblastoma."
25. The Full Commission gives greater weight to the medical testimony and opinions of Dr. Berry, a board-certified oncologist, than to that of the statisticians and toxicologist. The greater weight of the evidence shows that decedent was exposed to chemical fumes during the course of her employment with defendant and that this exposure significantly contributed to the development of her brain tumor. The greater weight of the evidence also shows that decedent was at an increased risk of developing brain cancer than members of the public not so exposed.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) it must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment;" and (2) it cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468;256 S.E.2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co.,79 N.C. App. 324, 331, 339 S.E.2d 490, 494 (1986).
2. In order to prove an occupational disease based upon chemical exposure, a claimant is not required to quantify the degree of exposure to the harmful agent during the employment. McCuiston v.Addressograph-Multigraph Corp., 308 N.C. 665, 303 S.E.2d 795 (1983);Matthews v. City of Raleigh, ___ N.C. App.___, 586 S.E.2d 920 (2003);Keel v. H V Inc., 107 N.C. App. 536, 421 S.E.2d 362 (1992).
3. Decedent's brain cancer was an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with defendant and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13).
4. Decedent's death occurred as the proximate result of the contraction of the occupational disease, and her heirs are entitled to death benefits under the Act. N.C. Gen. Stat. § 97-38.
5. Marshall Hardy, Elizabeth Hardy and William Hardy were wholly dependent upon decedent at the time of her death and are therefore entitled to death benefits, share and share alike. N.C. Gen. Stat. §§ 97-38, -39. Decedent did not leave any other persons who were either wholly or partially dependent upon decedent for support. Therefore, Marshall Hardy, Elizabeth Hardy and William Hardy are the only persons entitled to take the death benefits in this matter. Marshall Hardy is the father and natural guardian of the two minor children, Elizabeth Hardy and William Hardy.
6. Decedent's average weekly wage at the time of the contraction of the occupational disease was $704.83, yielding a compensation rate of $469.89.
7. Marshall Hardy is entitled to receive one-third of the death benefits at the rate of $156.63 per week for 400 weeks beginning October 29, 2000. The minor children, Elizabeth Hardy and William Hardy, are each entitled to receive one-third of the death benefits in the amount of $156.63 per week for 400 weeks beginning October 29, 2000 or until each child reaches the age of 18, whichever occurs last. N.C. Gen. Stat. § 97-38. Defendant shall pay said benefits to Marshall Hardy, the father and natural guardian of the minor children, for the use and maintenance of Elizabeth Hardy and William Hardy. N.C. Gen. Stat. §97-48.
8. Plaintiffs are entitled to payment of the medical expenses incurred for the treatment of decedent's occupational disease. N.C. Gen. Stat. § 97-25.
9. Defendant shall pay funeral expenses not to exceed $2,000.00 to the appropriate party who provided or previously paid for such services. N.C. Gen. Stat. § 97-40.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees approved below, defendant shall pay to Marshall Hardy death benefits at the rate of $156.63 per week for 400 weeks beginning October 29, 2000. Those amounts which have accrued shall be paid in a lump sum.
2. Subject to attorney's fees approved below, defendant shall pay to Marshall Hardy, the parent and natural guardian of Elizabeth Hardy and William Hardy, death benefits at the rate of $156.63 per week for each minor child beginning October 29, 2000 and continuing for 400 weeks or until each child reaches age 18, whichever occurs last. All sums that have accrued shall be paid in one lump sum.
3. Defendant shall pay burial expenses not exceeding $2,000.00 to the person or persons entitled thereto.
4, Defendant shall pay for all medical expenses incurred as a result of the occupational disease contracted by decedent.
5. A reasonable attorney's fee of 25% of the compensation awarded in Paragraphs 1 and 2 above is approved for plaintiffs' counsel and shall be deducted from the compensation awarded and paid directly to plaintiff's attorney.
6. Defendant shall pay the costs due the Commission.
This ___ day of February 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mb