***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for some modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On the relevant dates herein, an employment relationship existed between plaintiff and defendant-employer.
3. Companion Property and Casualty was the carrier on the risk.
4. The alleged injury or occupational disease date is June 30, 2000. Plaintiff started losing time from work on June 30, 2000, and she has not returned to work for defendant-employer.
5. Plaintiff's average weekly wage as of June 30, 2000 was calculated pursuant to a Form 22 wage chart submitted by defendants subsequent to the hearing before the Deputy Commissioner.
6. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties.
7. Plaintiff has not received any benefits under the North Carolina Workers' Compensation Act.
8. The depositions and records of Dr. Stuart M. Brooks, Dr. Gaku Ichihara, and Dr. Joseph K. Miller are a part of the evidence of record.
9. The parties stipulated into the evidence of record in this matter at the hearing before the Deputy Commissioner a packet of plaintiff's medical records.
10. The issues to be determined by the Commission are whether plaintiff contracted a compensable occupational disease as a result of chemical exposure while working for defendant-employer, and, if so, to what medical and/or indemnity benefits is plaintiff entitled to receive.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff was 37 years old, resided in Florida, and was taking classes at a community college towards an associate degree as a paralegal. Plaintiff was not working in any capacity at the time of the hearing before the Deputy Commissioner.
2. Plaintiff has a high school diploma. Plaintiff has a pre-existing history of asthma and osteoarthritis of both feet, as well as a previous lumbar strain.
3. Prior to the date of injury or occupational disease giving rise to this claim, plaintiff worked in the cushion and foam fabrication field for 10 years and was employed by several different companies. During these previous employments, plaintiff was exposed to chemicals such as polyurethane.
4. In July 1998, defendants hired plaintiff as a foam fabricator. Defendants are in the business of making cushions and other components for furniture. Plaintiff's last job for defendants was fabricating seat cushions, which involved gluing bands of foam to cushions. In this position, plaintiff used an air-controlled spray gun to spray the liquid glue.
5. Plaintiff assembled up to 200 cushions a day and applied the glue eight to twelve times per cushion. Plaintiff worked at least eight hours a day as a foam fabricator. In the two to three month period immediately preceding June 30, 2000, plaintiff assembled on average 230 to 240 cushions per day.
6. In June 1999, defendants began using a different kind of glue because the previous glue used in the cushion-making process had been found to be a possible carcinogen. The brand name of this new glue was Whisper Spray 155055 which is composed of 55 percent 1-bromopropane (hereinafter "1-BP").
7. While at work, plaintiff wore no protective clothes or covering other than latex gloves. When the glue was sprayed on the cushions with the air-controlled spray gun, it created a mist and settled on plaintiff's clothes and wrists.
8. While each individual table had a ventilation system with vents, at times the ventilation system was only on for about 15 minutes per hour and sometimes less due either to concerns about electricity costs or efficacy of the cooling system when the air conditioning was on. When the ventilation system was off, plaintiff and her co-workers were exposed to more glue fumes than if the system were on.
9. In addition, plaintiff was exposed to glue when she had to change the drums in which glue was stored. Plaintiff's exposure to this solvent was through both inhalation and skin contact.
10. In April 2000, plaintiff was diagnosed with sinusitis by a physician at MedZone. On June 5, 2000, plaintiff sought treatment at MedZone for a continued scratchy, sore throat, a hoarse voice, and some pain when swallowing. Plaintiff was given a course of antibiotics and a decongestant. Plaintiff returned to MedZone on June 8, 2000 when her symptoms got worse.
11. On June 26, 2000, plaintiff presented to Dr. Aldona Ziolkowska at High Point Primary Care with complaints of dizziness for the preceding four days, light-headedness, and a sore throat. Plaintiff was noted to have an abnormal pelvic examination, chronic osteoarthritis, and sinusitis.
12. Plaintiff fell on June 29, 2000 and almost fell but was able to catch herself the morning of June 30, 2000.
13. On June 30, 2000, plaintiff reported to the High Point emergency room and was referred to Dr. Joseph K. Miller, a neurologist, for her complaints of feeling off balance; sensations of weakness, numbness, tingling, and burning from the waist down; dizziness and staggering; and a feeling that something was stuck in the back of her throat.
14. Dr. Miller noted a diminished vibratory sensation at T6 to pinprick. Dr. Miller felt that plaintiff probably had a myelopathy that was either transverse myelitis or demyelinating disease secondary to multiple sclerosis and he ordered MRIs of plaintiff's head and thoracic spine.
15. Dr. Miller felt plaintiff's symptoms were genuine and suggested she be admitted to the hospital, which she declined.
16. Plaintiff went out of work as of June 30, 2000 on a medical leave of absence. Plaintiff did not return to work for defendants after June 30, 2000.
17. On June 30, 2000, plaintiff underwent thoracic and cervical MRIs and an MRI of her brain. Spondylosis was noted at C6-7, but all of the MRIs were otherwise normal. Dr. Miller then ordered EMG testing and nerve conduction studies on plaintiff's legs. These studies were also interpreted as normal. Blood tests for Lyme disease and vitamin B12 deficiency were negative, as were tests for multiple sclerosis and a urine screen for metal.
18. Plaintiff's symptoms worsened from June 30, 2000 and included tremors in her lower extremities, numbness in her genital and perineal areas, urinary frequency and occasional incontinence, headaches, insomnia, fatigue, and decreased appetite.
19. On July 3, 2000, plaintiff contacted Dr. Miller because she thought she had swallowed a spider a few weeks before while camping, and thought her symptoms might be the result of a bite to the back of her throat. Dr. Miller had no test for such a complaint.
20. On July 31, 2000, after reading about his research on the internet, plaintiff contacted Dr. Gaku Ichihara. Dr. Ichihara is a Japanese physician who is an associate professor at the University of Nagoya and was also doing research at Vanderbilt at the time. Dr. Ichihara did several toxicology studies on rodents that found that exposure to 1-BP at 800 ppm for eight hours per day for over four weeks can cause demyelination of peripheral nerves in rats. A Dr. Sclar in New Jersey reported that one of his patients developed symmetrical weakness of the lower extremities with hypesthesia and abnormal lower extremity EMGs after exposure to solvents composed of 95 percent 1-BP. However, this case was lost to follow up and consequently there was no subsequent confirmation of a solvent-induced neuropathy analogous to Dr. Ichihara's rodent studies.
21. Dr. Ichihara had also recently done a study in China in which he investigated workers at a factory where the solvent 1-BP is actually produced, and his study found that 17 out of 25 workers had a decrease in vibration sense. Dr. Sclar's patient and Dr. Ichihara's recent study in China are the only reported literature on the subject of human exposure to 1-BP other than literature subsequently documenting plaintiff's case, along with those of two of her coworkers.
22. Dr. Ichihara has never medically treated plaintiff but examined her and found an objective loss of vibration sense along with numbness in her legs. Based upon his examination of and communications with plaintiff, Dr. Ichihara found plaintiff had many similar symptoms to individuals in his study in China and animal studies he conducted.
23. Dr. Ichihara believed it was likely that plaintiff's symptoms and problems were due to her exposure to 1-BP in the workplace because he knew of no other factors that explain her symptoms. Dr. Ichihara also believed that plaintiff's job as a foam fabricator placed her at an increased risk of developing these problems as compared to members of the general public not so employed. Dr. Ichihara also stated that plaintiff's exposure to 1-BP in the workplace caused permanent peripheral nerve damage and permanent damage to her central nervous system.
24. Dr. Ichihara felt that plaintiff's exposure to 1-BP "may be nearly permanent" because of her continued reports of symptoms at the time of his deposition on June 19, 2002. Dr. Ichihara did not examine plaintiff at that time but based his opinion on information he had received from plaintiff in e-mails.
25. In conjunction with Dr. Miller, Dr. Ichihara published an article in the Journal of Occupational Health discussing plaintiff's case and the cases of two of her co-workers.
26. Dr. Miller continued to treat plaintiff through August 2000. During one of her visits to Dr. Miller's office, plaintiff encountered a co-worker in the waiting room who was waiting to see Dr. Miller. Plaintiff discovered that the co-worker, who was also exposed to 1-BP in the workplace, was experiencing many of the same symptoms as plaintiff. This connection between his two patients caused plaintiff and Dr. Miller to begin to suspect the involvement of an environmental neurotoxin, a substance that can cause injury or damage to nerves.
27. Several of plaintiff's coworkers who also worked with the glue testified at the hearing before the Deputy Commissioner that they experienced symptoms such as headaches, runny noses, burning throats, and a distaste in the mouth that they related to the spray glue used at defendant-employer's plant. Paula Wright testified she occasionally had a runny nose while working for defendants, but that she did not seek medical care for her symptoms. Ms. Wright also experienced a runny nose while working for other foam fabricators. Linda Bowling testified that her throat and nose dried out from breathing the glue fumes. Angela Kellison testified that she had frequent headaches, but never sought medical treatment.
28. Because of plaintiff's possible environmental exposure, Dr. Miller referred plaintiff to Duke University Medical Center's Division of Occupational and Environmental Medicine where she was seen by Dr. Dennis Darcy and Dr. Charles Goodno in August 2000. Plaintiff related to these physicians that she believed that her symptoms were due to the 1-BP in the spray glue she used at work.
29. Upon examination and after review of the myriad of diagnostic tests on plaintiff, there were no clear findings of peripheral neuropathy and no indication of demyelination. With the extremely limited medical literature and studies on human exposure to 1-BP and because plaintiff did not have clear symptoms of peripheral neuropathy and/or demyelination, Drs. Darcy and Goodno could not extrapolate the previous rodent studies or the study on Dr. Sclar's patient to apply to plaintiff's case, particularly since plaintiff's sensory level was more suggestive of a myelopathy. Instead, these physicians concluded it was more likely that the etiology of plaintiff's complaints was due to multiple sclerosis, post-viral myelopathy, and/or Lyme disease instead of due to a solvent-induced syndrome. However, Dr. Miller performed tests for these conditions with negative results.
30. Plaintiff last saw Dr. Miller on October 5, 2000. Dr. Miller kept plaintiff out of work from June 30, 2000 through October 5, 2000, at which time plaintiff was capable of returning to work with the sole restriction of no exposure to 1-BP.
31. In the course of his deposition, Dr. Miller opined that plaintiff's symptoms were consistent with an environmental neurotoxin exposure, in this case 1-BP, which he felt was the causative agent for plaintiff's neurological conditions. Dr. Miller also expressed the opinion that plaintiff's employment as a foam fabricator for defendant-employer placed her at an increased risk of the development of these conditions due to exposure when compared to exposure she might have had in the general environment. Dr. Miller further testified that as a result of her workplace exposure to 1-BP, plaintiff has sustained permanent damage to the small nerves in her peripheral nervous system that may not be identifiable on nerve conduction studies.
32. Dr. Miller referred plaintiff to Dr. Thomas G. Braun, a neurologist at UNC School of Medicine's Department of Neurology, for further testing. Plaintiff saw Dr. Braun on November 2, 2000 and again on December 13, 2000 after referring her to a gynecologist for her bladder complaints and sexual dysfunction. A lumbar MRI ordered by Dr. Braun was unimpressive with a mild central disc bulging at L5-S1.
33. Dr. Braun noted after a neurological examination that plaintiff's complaints were essentially subjective and after testing he did not find anything to lead to a diagnosis of multiple sclerosis or another demyelinating disease. Dr. Braun expressed "great doubts" that plaintiff's exposure to 1-BP "explains the constellation of her symptoms," and he recommended physical therapy to address concerns with plaintiff's gait.
34. Plaintiff did not return to work for defendants in October 2000, but instead she remained on a medical leave of absence through December 2000. Defendants offered plaintiff her former job without modifications. Plaintiff did not accept this job offer, but instead moved to Florida in December 2000. Plaintiff received no medical treatment after moving to Florida other than a course of physical therapy.
35. At the hearing before the Deputy Commissioner, defendants asked for an independent medical evaluation of plaintiff which was performed in Florida on May 24, 2002 by Dr. Stuart M. Brooks. Dr. Brooks felt that plaintiff's neurological examination was relatively normal, and he found no presence of peripheral neuropathy and no evidence of any other significant neurological condition. Dr. Brooks further felt that plaintiff does not suffer from an occupational disease or neurological disorder. He found no evidence to explain plaintiff's symptoms from a neurological standpoint.
36. After her move to Florida, plaintiff returned to the work force in April 2001 as a cook at a camp for troubled youth. Plaintiff worked two days a week, nine hours a day at $8.00 per hour. Plaintiff worked at this job for three weeks but voluntarily terminated her employment when she began having pain in her back and legs.
37. In August 2001, plaintiff returned to work for the same camp as a guard. Plaintiff worked eight hours a day, five days a week, at $8.00 per hour. She worked from August 13, 2001 to September 23, 2001 and testified that she stopped working due to increased pain.
38. Plaintiff next worked at Arby's as a cook from October 13, 2001 until December 19, 2001, working four hours a day, three days a week at $5.15 per hour. Plaintiff testified that she voluntarily left this job because the constant standing, lifting, and bending exacerbated her symptoms.
39. Plaintiff testified that she continues to have problems with incontinence, numbness from the waist down, pain in her back and legs, and problems with dizziness and balance.
40. Despite these ongoing medical problems, plaintiff has been a full time student in paralegal training for over a year, according to her testimony at the hearing before the Deputy Commissioner.
41. While the studies and literature on the effect of human exposure to 1-BP have been extremely limited, Dr. Miller testified that plaintiff's is the "sentinel case" that describes a human's adverse reaction to this neurotoxin. While the medical evidence is divided, the Commission affords greater weight to the testimony and opinions of plaintiff's treating physician, Dr. Miller, and to one of the world's experts on 1-BP, Dr. Ichihara. Accordingly, it is specifically found that plaintiff's exposure to 1-BP caused her to develop the neurological conditions described herein. This finding is also based in part on the fact that there is insufficient evidence of record from which the Commission can find and hold by the greater weight that there were any other causes, environmental or otherwise, to account for plaintiff's medical condition. In addition, plaintiff's job as a foam fabricator for defendant-employer placed her at an increased risk of developing these conditions and medical problems as compared to members of the general public not so employed.
42. The Commission affords greater weight to the opinion of Dr. Miller as compared with that of Dr. Ichihara concerning the extent of permanent damage sustained by plaintiff for two reasons: (1) plaintiff was actually treated by Dr. Miller and not by Dr. Ichihara, and (2) Dr. Ichihara is not licensed as a physician in North Carolina or in any other state. Accordingly, the Commission hereby finds that plaintiff sustained permanent damage to her peripheral nervous system as a result of her workplace exposure to 1-BP.
43. While Dr. Miller has testified that plaintiff may have difficulties with employability given her incontinence and transient weakness, he did not assign permanent work restrictions other than no exposure to 1-BP, and in fact felt that plaintiff was capable of returning to work as of October 5, 2000 with that one restriction. Furthermore, Dr. Miller testified that he was not in a position to determine plaintiff's current ability to work as it had been so long since he last examined and treated her.
44. Based upon the totality of the evidence presented, plaintiff was capable of some work as of October 5, 2000. The facts that she subsequently attempted to return to work on at least three separate occasions, that she has been able to maintain a full time class schedule, and that she has received no medical treatment since her relocation to Florida, other than physical therapy, are additional evidence that plaintiff was no longer totally disabled after October 5, 2000.
45. Based upon the Form 22 wage chart, plaintiff's average weekly wage as of June 30, 2000 was $336.70, which yields a weekly compensation rate of $224.47.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) it must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) it cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468;256 S.E.2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co.,79 N.C. App. 324, 331, 339 S.E.2d 490, 494 (1986).
2. As the result of plaintiff's workplace exposure to 1-BP, a neurotoxin, as of June 30, 2000 plaintiff contracted a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
3. As the result of her compensable occupational disease, plaintiff was temporarily, totally disabled from any employment and entitled to compensation at the rate of $224.47 per week from June 30, 2000 through October 5, 2000. N.C. Gen. Stat. § 97-29.
4. As the result of her compensable occupational disease, plaintiff sustained permanent damage to her peripheral nervous system, an important internal part of the body, for which she is entitled to reasonable compensation in the amount of $15,000.00. N.C. Gen. Stat. § 97-31(24).
5. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of the compensable occupational disease as may reasonably be required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19), -59.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay to plaintiff temporary total disability benefits at the weekly rate of $224.47 beginning June 30, 2000 and continuing through October 5, 2000. Said compensation has accrued and shall be paid in a lump sum.
2. Subject to the attorney's fee approved below, defendants shall pay to plaintiff $15,000.00 in compensation for her permanent injury to her peripheral nervous system. Said compensation shall also be paid in a lump sum.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of the total compensation awarded to plaintiff. Defendants shall deduct one-fourth of the total amount and shall forward this directly to plaintiff's counsel.
4. Defendants shall provide all related medical compensation that was or is reasonably necessary to effect a cure, give relief, or lessen the period of plaintiff's disability.
5. Defendants shall bear the costs of this proceeding.
This the 3rd day of March 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd