ROBERT F. GAY, EMPLOYEE, PLAINTIFF v. J. P. STEVENS & CO., INC., EMPLOYER; LIBERTY MUTUAL INSURANCE COMPANY, CARRIER, DEFENDANTS

No. 8510IC442

(Filed 18 February 1986)

1. **Master and Servant § 68— workers' compensation—employment in dye house —respiratory illness—sufficiency of evidence of occupational disease**

Evidence was sufficient to support the Industrial Commission's conclusion that plaintiff suffered from an occupational disease compensable under N.C.G.S. 97-53(13) where it tended to show that plaintiff worked for approximately 22 years in a textile dye house; the substances used in the dye house and their potentially harmful effects on the respiratory system were well documented; and an expert medical witness's testimony established that the conditions of plaintiff's employment possibly caused and probably aggravated his condition and that nothing in plaintiff's history other than his occupation could account for the severity of his obstructive lung disease.

2. **Master and Servant § 68— workers' compensation—occupational disease— levels of toxic fumes and dust—evidence not required**

In a workers' compensation claim where plaintiff alleged that he had an occupational disease caused by exposure to fumes and dust in the workplace, there was no merit to defendants' contention that the fact that levels of toxic substances in the dye houses and the concentration of dust in the warehouse where plaintiff worked were never actually measured rendered an expert medical witness's testimony regarding the effect of these substances mere speculation, since both of the dye houses in which plaintiff worked no longer operated and it would thus be impossible for plaintiff to obtain measurements of the levels of toxic substances therein; and the evidence on dye operations—in particular, the fact that the dyes were mixed in open containers—and plaintiff's health records sufficiently demonstrated plaintiff's occupational exposure to harmful levels of respiratory irritants.

3. **Master and Servant § 94.1— workers' compensation—last injurious exposure—insufficient findings**

Though evidence in a workers' compensation case was sufficient to support a finding that plaintiff was last injuriously exposed while in defendant's employment, the Industrial Commission failed to make adequate findings of fact and conclusions of law regarding plaintiff's last injurious exposure to the hazards of chronic obstructive lung disease.

APPEAL by defendants from opinion and award of the North Carolina Industrial Commission filed 16 August 1984. Heard in the Court of Appeals 30 October 1985.

Plaintiff filed this workers' compensation claim on 5 September 1979, alleging that he had an occupational disease caused by exposure to dust and fumes in the workplace. The hearing commissioner concluded that plaintiff's total disability was "caused by and results from a disease that was aggravated by causes and conditions characteristic of and peculiar to plaintiff's employment" and awarded compensation under N.C. Gen. Stat. 97-53(13). The Full Commission adopted the decision of the hearing commissioner.

Defendants appeal.

*Charles R. Hassell, Jr., for plaintiff appellee.*

*James W. Mason and Williamson, Dean, Brown & Williamson, by Andrew G. Williamson, Jr., for defendant appellants.*

WHICHARD, Judge.

Defendants contend the Commission erred in concluding that plaintiff suffers from an occupational disease compensable under N.C. Gen. Stat. 97-53(13). Alternatively, they contend that plaintiff was not injuriously exposed while in defendant-employer's employment and that the Commission erred in failing so to determine. We find sufficient evidence from which the Commission could conclude that plaintiff suffers from an occupational disease. We also find sufficient evidence from which the Commission could have concluded that plaintiff was last injuriously exposed to the causes of that disease while in defendant-employer's employment; however, we find the Commission's findings of fact and conclusions of law insufficient to support such a determination.

Appellate review of decisions of the Industrial Commission is limited to a determination of "whether there was competent evidence before the Commission to support its findings and . . . whether such findings support its legal conclusions." *McLean v. Roadway Express*, 307 N.C. 99, 102, 296 S.E. 2d 456, 458 (1982). This Court cannot substitute its judgment for that of the Commission. Thus, when supported by competent evidence, findings of fact made by the Commission are conclusive on appeal. *Id.; see*

*also Morrison v. Burlington Industries,* 304 N.C. 1, 6, 282 S.E. 2d 458, 463 (1981).

The evidence before the Commission tended to establish the following:

In 1947 plaintiff was employed by Old Scotland Mills. For approximately two years he worked in Scotland Mills' dye house operating a dryer which dried bedspreads that were wet from the dyeing process.

Plaintiff was next employed in the textile industry by Dixianna Rug Company in 1953. He worked in its warehouse for approximately five years "shipping rolled goods out of the warehouse."

In July 1958 plaintiff was again employed by Scotland Mills to work in the dye house located at its airbase facility. Spring Mills later purchased Scotland Mills. Plaintiff, however, continued to work in the dye house at the airbase facility. While there plaintiff worked for an unspecified period as a dryer, mixing dry or paste dye with water and adding it by hand to open dye tubs.

In January 1973 plaintiff was transferred to Spring Mills' Crandall plant. There he initially worked as a tub dumper, dumping wet bedspreads into an extractor which forced the water from the bedspread. Later he worked as a dye mixer, combining powdered dyes with liquids and heating the mixture. The dyes emitted visible dust as they were poured into open containers.

Plaintiff next worked as a tub operator. He loaded bedspreads into machines which functioned much like washers but were used to treat bedspreads with chemicals and heat to prepare them for the dyeing process. Plaintiff was exposed to the steam which emerged as the tub lids were opened.

From June 1974 until August 1974 plaintiff operated the machines in which finished bedspreads were dried. He was again exposed to steam when the dryers were opened.

On 4 August 1974 defendant-employer purchased the Crandall plant and began phasing out dyeing operations. Plaintiff continued to work in the dye house until 28 August 1974, when operations ceased. From then until he was "laid off" in December 1974, he worked as a yard man. On perhaps three occasions plain-

tiff transported barrels of old chemicals and dyes to a landfill and dumped them.

Ralph Askill, superintendent of dyes for defendant-employer, described the Crandall dye house as follows:

> The approximate  area of the bedspread area in the dye house is 72,000 square feet and is one continuous open area with the exception of a mezzanine. The extractors were located directly under the mezzanine. The dye tubs were located on the one side of the mezzanine and the dryers were located on the opposite side of the dye tubs. The dryers were on the ground floor. The extractors were also on the ground floor. The tubs were on the ground floor with a raised platform behind them where they did all the loading and the dye tubs began. The mixing was done above the ground floor in the dye room. It is located on the mezzanine probably 10 to 12 feet above the top of the extractors. It was over the dye tubs and about the same distance above the dye tubs that the extractors were from the dye tubs. This would be about 10 or 12 feet above the dye tubs. The extractors were probably 10 to 15 feet from the dye tubs, with the dryers being located about the same distance from the extractors. The platform I have described was approximately 12 feet above the ground floor. . . .

> The mezzanine is approximately in the center of the room. The extractor and the dryer are underneath. The distance between the mezzanine and the dryer was about 12 to 15 feet. The mezzanine was approximately 100 feet long. On the mezzanine was an enclosed drug room for the weighing of dye stuff. The remainder of it was opened with a wall approximately 5 to 6 feet high.

This evidence tends to indicate that someone working in the dye house would be exposed to the hazards of all phases of the dyeing process.

Plaintiff returned to work for defendant-employer in April 1975. From then until his retirement in July 1978 he worked in a warehouse handling finished products. The area was dusty due to the movement of products and boxes which had been stored for several months.

Many of the chemicals used by plaintiff's employers in the dyeing process are identified as respiratory irritants in Material Safety Data Sheets which were introduced into evidence. Although wearing a mask or other respiratory protective device when working with many of the chemicals in the dye house is recommended, plaintiff never wore such a device.

The following chemicals were used by plaintiff's employers in the dye houses: sodium hypochlorite, peroxide, sodium hydrosulfite (in powder form), acetic acid, soap flake, sodium carbonate, Cassofic FRW 3000, caustic soda, and chlorine. The evidence showed the following regarding these chemicals: Sodium hypochlorite was used in approximately twenty-five percent of the dye batches. When sodium hypochlorite is heated or comes in contact with acid, it emits toxic chlorine fumes. Hypochlorite solutions can be corrosive to the skin and mucous membranes. Vapors from peroxide are highly irritating to skin, eyes and respiratory passages. Respiratory protection is recommended with its use. Sodium hydrosulfite powder was used in the dyeing process and in cleaning machines. It is recommended that a dust mask be worn when handling hydrosulfite powder. Inhalation of the vapors emitted by acetic acid can cause coughing, chest pain and irritation of the nose and throat. Soap flake, sodium carbonate and Cassofic FRW 3000 are mild irritants to skin, eyes and mucous membranes. Inhalation of dust from these granular solids should be avoided. Overexposure to caustic soda is hazardous to skin, eyes and respiratory passages. The use of a safety mask is recommended to protect against the inhalation of the toxic dust and fumes caustic soda emits.

Health records maintained by plaintiff's employers indicate that in January 1967 he was burned when he opened a valve on a tank and caustic soda splashed in his nose. In 1973 plaintiff suffered a second caustic soda burn under his left eye.

Other incidents documented in plaintiff's health records further indicate the extent to which he came in direct contact with the chemicals used in the dyeing process. In 1967 plaintiff injured his finger attempting to untangle a bedspread caught in a dye tub. In 1968 he slipped and sprained his shoulder when a dye tub overflowed. In 1969 plaintiff was treated for chlorine in his ear. In 1971 all employees were evacuated due to a chlorine gas leak.

Plaintiff was treated for inhalation of chlorine gas. He was given oxygen, an eyewash, and medication. Defendant-employer's superintendent did not recall the evacuation of employees due to a gas leak, but did "recall *occasions* in which chlorine gas . . . escape[d]."

Three physicians testified concerning plaintiff's condition. Each diagnosed plaintiff as suffering from chronic obstructive lung disease. In their opinions his condition is permanent and totally disabling. Two of the physicians, Drs. Woolfolk and Hayes, were under the mistaken impression that plaintiff had worked in a cotton mill and had been exposed to cotton dust for an extended period of time. Thus, they were not prepared to testify concerning the existence of a causal link between plaintiff's actual work environment and his obstructive lung disease. After being informed of the nature of plaintiff's employment and the chemicals involved, however, Dr. Woolfolk testified:

> If [plaintiff] were exposed to anything that contained chlorine, which is a toxic substance to the lungs, I think it would be extremely significant. It would be significant as causing pulmonary disease, breaking down various lung tissues. . . . It is my opinion that an individual exposed to chlorine or other substances in the dye house would be at an increased risk than individuals not exposed.

The third physician, Dr. Khodaparst, testified that in his opinion plaintiff's work environment was a "possible . . . causative agent" and that "it is probable that [it] aggravated his disease." Dr. Khodaparst particularized as follows:

> Well, its chlorine gas. . . . [C]hlorine could cause severe airway inflammation and destruction and I'm not putting chlorine as the causative agent, but I would say it is possible one of these gases . . . initially caused airway disease and continuous exposure has aggravated and continuous destruction, thereon, went on and caused this disease.

Dr. Khodaparst explained that while it is possible that claimant's occupational exposure was the "[i]nitial factor which produced inflammation of the lung and destruction and changes . . . [,] as he worked it is probable . . . that . . . other fume[s] and gases or dust he was exposed to aggravated" the disease. When asked

whether plaintiff's occupational exposure "placed him at an increased risk of aggravation of obstructive lung disease . . . beyond members of the general public not so exposed," Dr. Khodaparst responded, "[p]robably, yes."

Plaintiff is a nonsmoker. Except for his occupation, Dr. Khodaparst found no "other factors present in [plaintiff's] history which could account for his obstructive lung disease as severe as it is." Dr. Khodaparst testified as follows regarding plaintiff's occupational exposure while in defendant's employment:

> My opinion as to whether it is probable that [plaintiff's] exposure in his employment aggravated his obstructive lung disease up until the date he last worked in 1979 is . . . when he came to the hospital and was told to go back to his work, what he used to do. He clearly told me that "Doc, I can't go to work, it makes my breathing worse and it causes my symptoms — my shortness of breath to be worse. I can't go back to that same job." . . .

> \*        \*        \*

> If someone has lung disease, asthma or chronic bronchitis, exposure to dust, it could aggravate the disease if one was working in a warehouse, depending on what kind of warehouse it was. It is probable that certain warehouses aggravate the patient's illness. . . .

A disease is an occupational disease compensable under N.C. Gen. Stat. 97-53(13) if claimant's employment exposed him "to a greater risk of contracting this disease than members of the public generally . . ." and such exposure "significantly contributed to, or was a significant causal factor in, the disease's development." *Rutledge v. Tultex Corp.*, 308 N.C. 85, 101, 301 S.E. 2d 359, 369-70 (1983). Ultimately, the Commission must determine "whether the occupational exposure was such a significant factor in the disease's development that without it the disease would not have developed to such an extent that it caused the physical disability which resulted in claimant's incapacity for work." *Id.* at 102, 301 S.E. 2d at 370. In determining the role claimant's occupational exposure played in the development of the disease, the Commission may consider, in addition to expert medical testimony, factual circumstances which bear on the question of causa-

Gay v. J. P. Stevens & Co.

tion. *Id.* at 105, 301 S.E. 2d at 370. Thus, the Commission may consider (1) the nature and extent of claimant's occupational exposure, (2) the presence or absence of other non-work-related exposures and components which contributed to the disease's development, and (3) correlations between claimant's work history and the development of the disease. *Id.* The claimant carries the burden of proving the existence of a compensable claim. *Davis v. Raleigh Rental Center,* 58 N.C. App. 113, 117, 292 S.E. 2d 763, 766 (1982).

N.C. Gen. Stat. 97-57 provides that

> [i]n any case where compensation is payable for an occupational disease, the employer in whose employment the employee was last injuriously exposed to the hazards of such disease, and the insurance carrier, if any, which was on the risk when the employee was so last exposed under such employer, shall be liable.

If the occupational exposure in question is such that it augments the disease process to any degree, however slight, the employer is liable. *Rutledge,* 308 N.C. at 89, 301 S.E. 2d at 362. In addition, the substance to which plaintiff was last injuriously exposed need not be a substance known to cause the disease. *Caulder v. Waverly Mills,* 314 N.C. 70, 74, 331 S.E. 2d 646, 649 (1985).

[1] The evidence, considered in light of the foregoing legal principles, is sufficient to support the conclusion that plaintiff suffers from an occupational disease compensable under N.C. Gen. Stat. 97-53(13).[1] There is ample evidence from which the Commission

---

1. The Commission concluded that claimant's "disability is caused by and results from a disease aggravated by causes and conditions characteristic of and peculiar to plaintiff's employment." The Commission cited and adopted the language of *Walston v. Burlington Industries,* 304 N.C. 670, 679-80, 285 S.E. 2d 822, 828 *as amended by Order,* 305 N.C. 296, 297 (1982) ("Disability caused by and resulting from a disease is compensable when, and only when, the disease is an occupational disease, or is aggravated or accelerated by causes and conditions characteristic of and peculiar to claimant's employment.").

While it is difficult to reconcile the *Rutledge* test with the test articulated in *Walston* and relied upon by the Commission, *see Mills v. Fieldcrest Mills,* 68 N.C. App. 151, 155-56, 314 S.E. 2d 833, 836-37 (1984), by finding that "[t]here are no other explanations or factors known that can account for the severe nature of plaintiff's lung disease other than his exposure to dust and fumes in the dye house and warehouse," the Commission essentially found that "the occupational exposure was

could conclude that plaintiff's work exposed him to a greater risk of contracting chronic pulmonary lung disease than members of the public generally and that occupational exposure substantially contributed to the disease's development. *Rutledge, supra.* The substances used in the dye houses and their potentially harmful effects on the respiratory system were well-documented. Dr. Khodaparst's testimony established that the conditions of plaintiff's employment possibly caused and probably aggravated his condition, and that nothing in plaintiff's history other than his occupation could account for the severeness of his obstructive lung disease.

[2] Defendants contend, however, that the fact that the levels of toxic substances in the dye houses and the concentration of dust in the warehouse were never actually measured renders Dr. Khodaparst's testimony regarding the effect of these substances mere speculation. In particular, they refer to the following testimony:

> Q. [A]nd without actually knowing what type of dust or the concentration of the dust, its effect on [plaintiff] would be mere speculation on your part, wouldn't it, Doctor?

> A. Yeah, you see, I don't know the normal dust speculation.

> Q. And that's true, too, while [plaintiff] was working in the warehouse, you would, excuse me, in the dye house, as to whether or not any dyes or fumes would have any effect upon him you would first have to know the concentration of the fumes, the amount of the fumes, would you not, the kind of fumes, would you not?

> A. The kind of fumes?

> Q. Kind of fumes.

> A. It was some kind of fumes — it is kind of fumes.

such a significant factor in the disease's development that without it the disease would not have developed to such an extent that it caused the physical disability which resulted in claimant's incapacity for work." *Rutledge,* 308 N.C. at 102, 301 S.E. 2d at 370. Thus the Commission's conclusion that plaintiff suffers from an occupational disease compensable under N.C. Gen. Stat. 97-53(13) can be upheld under *Rutledge. Cf. Adkins v. Fieldcrest Mills,* 71 N.C. App. 621, 322 S.E. 2d 642 (1984) (findings insufficient under the *Rutledge* test).

Q. And also you would have to know the amount of the concentration, wouldn't you?

A. Sometimes, not all the time.

Q. And for you to say that while [plaintiff] worked in a dye house, you could not accurately state that the fumes from any dyes had any effect upon him without first knowing the concentration and the type and the amount of dyes, could you doctor?

A. Yes, that's true, but as you noted, sir, that the name of the fume now is like chlorine and carbon tetrachloride . . .

Q. Doctor, you would first still have to know the amount of concentration of the chlorine, would you not?

A. That's for sure. You'd have to know how much.

Q. And so any statement that you make here today, as to its effect upon [plaintiff] is mere speculation, isn't it?

A. Yes, that's why I said possible.

Q. It's possible.

A. Yes.

Q. Cause you don't know the concentration, do you? You don't know how much he inhaled or if he inhaled any, do you?

A. I don't.

Q. And without those figures, it's mere guess work, isn't it?

A. A possibility.

Our Supreme Court has rejected a similar contention under N.C. Gen. Stat. 97-53(28), which restricts an employee's recovery for loss of hearing to that resulting from sound of an intensity of more than 90 decibels. The Court responded to an employer's contention that the employee must introduce evidence that the noise level to which he was exposed exceeded ninety decibels by stating:

It is unreasonable to assume that the legislature intended an employee to bear the burden of making noise-level measure-

ments during his employment in order to lay the groundwork for a worker's compensation claim. Such an interpretation of the statute would make it virtually impossible for an employee to successfully bring suit for compensation for a hearing loss, due to the difficulty he would encounter in attempting to make measurements of sound on his employer's premises. A construction of the statute which defeats its purpose — to provide a means by which employees can recover for injury due to harmful workplace noise — would be irrational and will not be adopted by this Court.

*McCuiston v. Addressograph-Multigraph Corp.*, 308 N.C. 665, 668, 303 S.E. 2d 795, 797 (1983).

Here, both of the dye houses in which plaintiff worked no longer operate. It thus would be impossible for plaintiff to obtain measurements of the levels of toxic substances therein. The evidence on dye house operations — in particular, the fact that the dyes were mixed in open containers — and plaintiff's health records sufficiently demonstrate plaintiff's occupational exposure to harmful levels of respiratory irritants. We thus reject defendants' contention. *McCuiston, supra.*

[3] We also find sufficient evidence to support a finding that plaintiff was last injuriously exposed while in defendant's employment. The Commission, however, failed to make adequate findings of fact and conclusions of law regarding claimant's last injurious exposure to the hazards of chronic obstructive lung disease. The Commission's findings and conclusions refer simply to "plaintiff's exposure" and "plaintiff's employment," and at no time refer singularly to plaintiff's exposure while in defendant-employer's employment.

The Commission must make specific findings of fact as to each material fact upon which the rights of the parties depend. *Wood v. Stevens & Co.*, 297 N.C. 636, 640, 256 S.E. 2d 692, 695 (1979); *Moore v. Stevens & Co.*, 47 N.C. App. 744, 749, 269 S.E. 2d 159, 162 (1980), *disc. rev. denied*, 301 N.C. 401, 274 S.E. 2d 226 (1980). In the absence of findings of fact sufficient to enable this Court to determine the rights of the parties, the cause must be remanded to the Commission for proper findings. *Young v. Whitehall Co.*, 229 N.C. 360, 369, 49 S.E. 2d 797, 803 (1948); *Moore*, 47 N.C. App. at 749, 269 S.E. 2d at 162.

While in defendant-employer's employment, plaintiff worked in the dye house for only twenty-two and a half days, during which the dyeing operations were winding down. Plaintiff's only other exposure to the chemicals used in the dye house was while transporting and dumping old dyes on possibly three occasions. While there was sufficient evidence from which the Commission could conclude that dusty warehouse conditions aggravated plaintiff's disease while in defendant-employer's employment, the Commission need not have reached this result. The cause thus must be remanded for a determination as to last injurious exposure.

The opinion and award is affirmed insofar as it determines that plaintiff has an occupational disease. The cause is remanded for a determination, based on proper findings of fact, *Moore, supra,* as to whether plaintiff was "last injuriously exposed" while in the employment of defendant-employer. The Commission may receive additional evidence for that purpose and enter new findings and conclusions as appropriate. *See Parrish v. Burlington Industries, Inc.,* 71 N.C. App. 196, 199, 321 S.E. 2d 492, 495 (1984).

Affirmed in part, and remanded.

Chief Judge HEDRICK and Judge JOHNSON concur.