***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award of the Deputy Commissioner. The Full Commission AFFIRMS the Opinion and Award of Deputy Commissioner Chapman with some modifications and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The defendant New Hanover County Sheriff's Department is a duly qualified self-insured with the PMA Insurance Group acting as its adjusting agent.
3. Employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the employer and the employee on March 20, 2000.
4. The parties agree that employee-plaintiff's average weekly wage on March 20, 2000 was $569.10 yielding a compensation rate of $381.29.
5. The parties stipulated into the evidence of record the following at the hearing before Deputy Commissioner Chapman:
a. Copy of plaintiff's personnel file.
 b. Packet of medical records and reports submitted on July 21, 2003.
The Pre-Trial Agreement dated March 4, 2003, which was submitted by the parties, is incorporated by reference.
6. The issues before the Commission are whether plaintiff developed an occupational disease as a result of his employment with defendants, and, if so, to what benefits is he entitled.
 *********** EVIDENTIARY RULING
1. Following the hearing, plaintiff moved that the report of Dr. James Howard dated March 2, 2002 be received into evidence. The report was not included in the stipulated medical records but had been listed as an exhibit that plaintiff intended to offer in the pre-trial agreement. Mr. McCurry indicated that defendant had indicated willingness to stipulate to the report as long as the doctor was deposed. Although the doctor's deposition was scheduled after the hearing before the Deputy Commissioner, it was not completed because the doctor was apparently hospitalized with a terminal illness. Plaintiff was therefore unable to get the report authenticated. Defendant objected to the introduction of the report since defendant was unable to cross-examine the doctor regarding his history and findings.
2. This case involves a psychiatric illness which plaintiff is claiming constitutes an occupational disease under the Workers' Compensation Act. Dr. Howard was not one of plaintiff's treating physicians but was a doctor hired by his attorney to provide an independent psychiatric evaluation. Under the circumstances, the Full Commission has reviewed the report which contains a history that is not consistent with the findings of fact made in this decision. In addition, Dr. Howard attributed plaintiff's problems to a single event occurring at work instead of to his job as a whole. Consequently, the report did not appear to have enough probative value to overcome defendant's objection, and therefore the report is not received into evidence.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who is forty-six years old, began working for defendant in 1987 as a deputy sheriff. Plaintiff previously served in the Coast Guard for approximately ten years. Once he began working for the sheriff's department, plaintiff was assigned to a position as a patrol officer, and he worked in that capacity until 1992 when he became one of the K-9 officers.
2. In approximately April 1994 plaintiff was transferred to a position at the county jail where he was in the custody division, although he was allowed to keep the dog with whom he had worked in the K-9 division. Plaintiff initially worked in the jail in downtown Wilmington but was later moved to the jail annex and was eventually transferred to a position in booking.
3. The booking job involved questioning incoming prisoners regarding their personal and medical information and potential suicide risks, entering data into the computer, taking their photographs, searching them, getting prison clothing for them, providing linens and a toiletry kit and, at the appropriate time, taking them upstairs to the jail. At some time during his shift, he also went into the cellblock to help count and feed the inmates.
4. Plaintiff did not like working in the jail and put in ten to fifteen transfer requests, but he was not allowed to transfer to a different position. However, he was ultimately promoted to a supervisory position as a corporal and was pleased with the promotion.
5. At an unknown time in the early 1990's, plaintiff underwent marriage counseling because of difficulties he and his wife were experiencing. In August 1994 he was admitted to a psychiatric facility after friends became concerned that he was suicidal. At that time, plaintiff and his wife were separated, he had a relationship with another woman and he was extremely conflicted because his wife wanted to reconcile. Dr. Taylor, the psychiatrist who treated him there, found him to be severely depressed due to this marital conflict. Because of the short hospitalization, Dr. Taylor was unable to determine whether the depression was simply an adjustment disorder associated with plaintiff's then current problems or whether it was a longer-term major depressive disorder.
6. Plaintiff's personal problems in 1994 caused him to not function well at work and he was not given a good performance review by his supervisor, although his supervisor recognized that personal issues were distracting plaintiff at work. Plaintiff and his wife reconciled and his work performance improved so that he was ultimately promoted.
5. In 1990 plaintiff was involved in a motor vehicle accident at work and injured his neck and back. He complained of persistent pain associated with that injury up until he left the department. Plaintiff had subsequent injuries, including another back injury in February 1994, a razor cut to his thumb during a search in January 1998, an injury occurring in March 1999 when an inmate elbowed him in the ribs and a rotator cuff injury occurring on June 30, 1999.
6. Plaintiff was very close to his parents, who lived in the area. In approximately November 1997 his father had a stroke. Although his mother was the primary care giver after the stroke, plaintiff and his brother helped her. Due to several more strokes, his father's condition deteriorated by December 1999 to the point that he was admitted to a hospice facility.
7. On December 27, 1999 plaintiff's mother was involved in an automobile accident and died as a result of injuries she sustained in the accident. The next month, plaintiff's dog, who had been his K-9 assistant at work, died.
8. While he was still grieving these losses, his father died on February 16, 2000. For understandable reasons, plaintiff was devastated after his father died and took off from work for several weeks to recover. He then returned to work.
9. On an uncertain date several weeks after plaintiff returned to work, he requested permission to leave work in order to see a doctor because he was experiencing some nausea and thought that he might have a virus. Plaintiff and his supervisor, Sergeant Hatch, did not get along very well generally and plaintiff had used practically all of his sick and vacation leave. When Sergeant Hatch received the request, he called plaintiff to his office and informed plaintiff that just because his parents had died, he was not entitled to special treatment. The remark was extremely upsetting to plaintiff who blew up at Sergeant Hatch and then, instead of striking out at his supervisor, left and went to Lieutenant Christine Hart's office.
10. Plaintiff was so furious and upset that he was shaking and crying. He had previously gone to Lieutenant Hart to express his frustration with the working conditions at the jail and she had listened sympathetically.
11. Lieutenant Hart listened to plaintiff on this occasion, but he said something about Sergeant Hatch which appeared to be threatening, so she decided to relieve him of duty. The chief jailer asked plaintiff to leave his weapon as he was leaving, and he did so. Plaintiff was also instructed to see Art Lorca, a counselor who had been retained by the sheriff's department for the benefit of the jail staff and inmates.
12. Plaintiff saw Mr. Lorca on April 11, 2000 and discussed his symptoms of severe depression associated with the major stressors he had experienced during the previous six months. Mr. Lorca referred plaintiff to Dr. Koff, a psychiatrist, and advised him to stay out of work.
13. On April 13, 2000 plaintiff went to Dr. Koff. Plaintiff was taking an anti-depressant at the time which did not seem to be helping him much. The stressors plaintiff described to the doctor included the death of his parents, the death of his dog and chronic back pain. He also described the incident in which he exploded at his supervisor, and plaintiff indicated that he dreaded returning to work. However, plaintiff did not mention his psychiatric hospitalization in 1994, so Dr. Koff was of the impression that this was his only episode of clinical depression.
14. Dr. Koff changed plaintiff's medication and referred him to Ronald Knopf, a clinical social worker, for counseling. Mr. Knopf began seeing plaintiff on April 18, 2000 with the objective of helping plaintiff reduce his anxiety and deal with his depression.
15. Despite medication and counseling, plaintiff continued to have problems with sleep disturbance, extreme irritability, aggitation and anger. He began to focus more on the problems at work and became quite stressed at the thought of returning to the jail.
16. Dr. Koff kept plaintiff out of work. Plaintiff's condition appeared to improve by fall of 2000, but one of his daughters became seriously ill by October 2000 and plaintiff's condition was noted to have worsened around that time. Plaintiff reported marital conflict associated with his irritability and also indicated that he had problems losing his temper and going into a rage.
17. Plaintiff did not like to be around crowds, and the traffic in Wilmington bothered him. He repeatedly expressed an interest in moving to Florida. Once his parents' estates closed, plaintiff bought some farmland in northwest Florida, and he and his family moved there in the summer of 2001.
18. On September 18, 2001, plaintiff went to Life Management Center of Northwest Florida and saw Pat Bennett, a social worker, in order to receive further treatment for his psychological problems. Mr. Bennett provided further counseling and sent him to Dr. Gray, a psychiatrist at the center, for medical management.
19. Dr. Gray diagnosed plaintiff with a dysthymic disorder manifested as depression and anxiety, an impulse disorder and a personality disorder and prescribed plaintiff medication.
20. Mr. Bennett worked with plaintiff regarding anger control since plaintiff had problems with flying into a rage and throwing things. By September 2002 Dr. Gray was of the opinion that plaintiff's depression was under control and he noted on November 4, 2002 that plaintiff's depression and anxiety were resolved with Effexor.
21. In his deposition, Dr. Gray indicated that plaintiff's condition had stabilized and that it would be beneficial for him to find another type of job besides law enforcement. Dr. Gray recommended a vocational rehabilitation program. Plaintiff had not participated in such a program or returned to work as of the date of hearing before the Deputy Commissioner.
22. Plaintiff filed this claim alleging that his psychological problems were due to stress associated with his job at the New Hanover County Jail. Defendant then sent him for an independent psychiatric evaluation to Dr. Rollins, a psychiatrist. Dr. Rollins had plaintiff first undergo psychological testing by Verne Schmickley, Ph.D., a psychologist.
23. Dr. Schmickley interviewed plaintiff on June 16, 2002 and had him undergo several tests, including the Beck Depression Inventory II, the Post Traumatic Stress Disorder Scale, the MMPI-2 and the Validity Indicatory Profile. Plaintiff's scores indicated that he had serious psychological problems, including moderate to severe depression, a tendency to respond to psychological stress with physical symptoms and problems with his thinking processes so that he did not cope well with stressors. Dr. Schmickley diagnosed plaintiff with a depressive disorder, an impulse control disorder, somatoform features and a personality disorder with avoidant and paranoid features.
24. Plaintiff then saw Dr. Rollins on June 22, 2002. He reported symptoms of anxiety, difficulty dealing with people, avoidance of crowds, wanting to stay by himself, an explosive temper and decreased energy, sleep, concentration and memory. Dr. Rollins also took a history of what had happened in plaintiff's life prior to the incident at work. After reviewing the psychological report and the records of the doctors and social workers who had treated plaintiff, Dr. Rollins diagnosed him with a depressive disorder, an impulse control disorder, a relational problem and a personality disorder. Dr. Rollins also noted that impulsivity had contributed to difficulty in plaintiff's interpersonal relationships, although he was a loner by nature and had problems with interpersonal relationships by virtue of his personality. In Dr. Rollins' opinion, plaintiff's ultimate adjustment would depend upon his motivation to reengage the world, and the doctor questioned whether plaintiff would be able to leave his self-imposed isolation.
25. The Full Commission finds, based upon the greater weight of the credible medical evidence, that plaintiff developed severe depression by February 2000 when his father died and that he sustained major personal losses with the deaths of his parents within less than two months, as well as the death of his dog, who had been his K-9 assistant at work.
26. Further, the evidence showed that plaintiff's job as a deputy sheriff assigned to the jail involved exposure to inmates who tried to smuggle drugs and other contraband, who got into fights, who made weapons out of things allowed in the jail, who destroyed property and who were potentially at risk for committing suicide. The jail was overcrowed and there was not only friction among the inmates, but also friction between the officers and employees working there.
27. During the period of his employment in the jail, plaintiff was in scuffles with inmates and found one inmate who committed suicide. That event occurred before August 1998 when he was assigned to work at the jail annex on the booking squad, a position which required much less time in the cellblock. In addition, the jail annex housed inmates who committed minor offenses or misdemeanors, who had not paid child support or who had been sentenced to serve weekends in jail. Consequently, the inmate population where he was working during the time in question was not as violent or aggressive as that in the main jail. However, there were problems at the annex, as well.
28. Plaintiff had a history of problems with depression unrelated to his employment and he was first hospitalized in August 1994 for those problems. According to the psychological testing performed by Dr. Schmickley, plaintiff had long-term psychological problems and a personality disorder which caused him to be predisposed to having difficulty coping with stress. Due to plaintiff's preexisting difficulties, his personality disorder and the major personal losses during the months preceding his blow-up at work, the doctors who saw him were unable to agree on the extent to which his job contributed to his condition, if at all.
29. Dr. Koff was of the opinion that plaintiff's job significantly contributed to plaintiff's condition. Dr. Gray had no opinion since he had not seen plaintiff during the first year of symptoms. Dr. Schmickley did not believe that plaintiff's work was a significant contributing factor but thought that plaintiff normally had a lot of depression and that the deaths of his parents had given him more stress than he could handle. Dr. Rollins related plaintiff's depression primarily to the loss of his parents and was of the opinion that his difficulties at work were the result of his ongoing psychological problems, as opposed to being the cause of those problems. Dr. Rollins also thought that it was significant that plaintiff's condition did not improve once he stopped working.
30. The Full Commission finds that the stressful environment at plaintiff's workplace was a significant factor in the development of his depression. However, none of the medical experts testified that plaintiff was placed at an increased risk of developing depression or the other psychological problems with which he was diagnosed by virtue of his employment with defendant-employer as compared to the general public not so employed.
31. The Full Commission finds based upon the greater weight of the evidence of record that plaintiff did not develop an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant and which excluded all ordinary diseases of life to which the general public was equally exposed.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. §97-53(13) if two conditions are met: (1) it must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) it cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment."Booker v. Medical Center, 297 N.C. 458, 468; 256 S.E.2d 189, 196
(1979); Pitillo v. N.C. Dep't of Envtl. Health Natural Res.,151 N.C. App. 641, 566 S.E.2d 807 (2002). The claimant bears the burden of proving the existence of an occupational disease. Gayv. J.P. Stevens Co., 79 N.C. App. 324, 331, 339 S.E.2d 490, 494
(1986).
2. Plaintiff failed to prove his depression is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment. Although the greater weight of the medical testimony causally related plaintiff's medical condition to his employment, no expert medical testimony was offered to show that plaintiff was at an increased risk of contracting depression because of his employment with defendant-employer. Norris vs. Drexel Heritage Furnishings, Inc.,139 N.C. App. 620, 534 S.E.2d 259 (2000). Therefore, there is insufficient expert medical evidence of record to support a finding that plaintiff's employment with defendant-employer placed him at an increased risk of contracting depression as compared to the public not so equally exposed. N.C. Gen. Stat. §97-53(13).
3. Plaintiff is, therefore, not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act.Id.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim for workers' compensation benefits must be and is hereby DENIED.
2. Defendant shall pay an expert witness fee in the amount of $280.00 to Dr. Gray.
3. Each side shall pay its own costs.
This the 18th day of May, 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
LKM/kjd