***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Berger and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the Deputy Commissioner's hearing as:
 STIPULATIONS
1. It is alleged that on March 27, 1999, Jimmy Phelps (hereinafter "decedent") died from aplastic anemia.
2. August 7, 1996, was decedent's last date worked and at such time the employee-employer relationship existed between plaintiff and defendant-employer.
3. Decedent's average weekly wage was $440.00 per week, yielding a compensation rate of $293.34.
4. Kemper Insurance was the carrier on the risk from July 1, 1995 through June 29, 1996.
5. The North Carolina Selective Fund was the carrier on the risk for June 30, 1996 through August 7, 1996, when plaintiff last worked.
6. The parties stipulated into evidence the September 5, 2002 hearing transcript and the June 9, 2003 hearing transcript for I.C. No. 821763, Terry Bowles v. BCJTrucking Services, Inc., et al.
7. An index of medical records was marked as stipulated exhibit 1 and received into evidence.
8. A death certificate was marked as stipulated exhibit 2 and received into evidence.
9. All Industrial Commission forms were entered into evidence by stipulation of the parties.
10. The issues before the Commission are whether decedent contracted an occupational disease, aplastic anemia, as a result of his employment with defendant-employer which resulted in decedent's death on March 27, 1999, and, if so, what are the compensable consequences thereof; and if decedent contracted an occupational disease, which carrier was on the risk at the time of his last injurious exposure.
11. The Material Safety Data Sheet for Varsol 18 was marked as plaintiff's exhibit 1 and received into evidence.
12. A work calendar was marked as defendant's exhibit 2 and was received into evidence.
 ***********
Based upon all of the competent evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Decedent was employed by defendant-employer for over 20 years in the high-level inspection department as a team leader processing crankshafts. Decedent's primary job duties were to prioritize the workflow, move parts around the plant by using a forklift, and fill in for other employees.
2. In the summer of 1996, decedent became ill and in August 1996 decedent was diagnosed with aplastic anemia. He last worked for defendant-employer on August 7, 1996. Decedent developed a series of infections in late 1998 and on March 27, 1999, decedent died as a result of contracting sepsis, a fungal infection of the lung. This infection was a direct and natural result of the aplastic anemia that decedent developed.
3. Aplastic anemia is a disorder of the bone marrow in which the primary cells of the bone marrow, which produce the blood cells, are damaged. This damage includes a decrease in the production of white blood cells. Decedent experienced damage to his blood cells, increasing his risk for the infection he contracted in his lung that resulted in his death. Aplastic anemia can be caused by an auto-immune process, by exposure to a toxic agent such as chemotherapy, or may be idiopathic. Exposure to sufficient amounts of the chemical benzene has been associated with blood disorders of this nature.
4. Material Safety Data Sheets (MSDS) provided by defendant-employer revealed that the product Varsol 18 (hereinafter "Varsol") was used to clean equipment in the maintenance department at the plant site where decedent was employed by defendant-employer. Varsol contains .2 percent benzene in its total composition.
5. James Green, decedent's supervisor, testified at the hearing before the Deputy Commissioner and later by deposition. According to Mr. Green, decedent had daily exposure to Varsol and dipped dirty crankshafts into the chemical, which was diluted with water. Mr. Green conceded, however, that there was only one drum of Varsol in the entire plant and that the drum was moved to a detached warehouse in 1992. The Commission finds that Mr. Green's testimony at the hearing and then by deposition was inconsistent and not credible. Mr. Green was unable to accurately identify the chemicals used in the crankshaft cleaning process.
6. Greater weight is given to the testimony of Joseph Elmore, plant manager and chief engineer, and James McCarver, vice president and general manager of defendant-employer, who testified that the material used in the dip tanks was soluble oil, a general metal cutting fluid. After crankshaft parts were blasted to remove rust, the parts were dipped in the soluble oil to leave a very thin film of oil to retard rusting. Mr. Elmore also testified that Varsol does not dissolve in water and cannot be mixed with water and that Varsol was only used by the maintenance staff on a very occasional basis and in very small quantities.
7. Decedent's job duties did not require him to use Varsol. In the high-level inspection area where decedent worked, crankshafts were dipped into a solution that did not contain Varsol. The maintenance department where Varsol was used was a completely separate department from the high-level inspection area where decedent worked. Only mechanics were permitted to use Varsol to clean parts. Further, the MSDS sheets indicate that any benzene contained in the solution was within the acceptable parts-per-million standard. Decedent may have incidentally been exposed to this product during the time period that he was employed by defendant-employer, but any exposure was minimal. Mr. Elmore testified that at most decedent may have worked with Varsol or supervised its use two to three times a year.
8. The medical evidence shows that aplastic anemia may also be caused by exposure to insecticides. Decedent lived near an apple orchard that was regularly sprayed with pesticides/insecticides. In addition, cigarette smoke contains benzene. Decedent smoked half a pack of cigarettes a day for 20 years.
9. Prior to his death, decedent was treated by Dr. Richard Orlowski, an expert in hematology and oncology, in Hickory. Dr. Orlowski testified at his deposition that neither decedent nor his wife ever indicated to him that decedent was exposed to any chemicals at work. When asked by plaintiff's counsel if decedent's job exposed him to an increased risk of developing aplastic anemia, Dr. Orlowski responded, "benzene is a known offender for hematologic problems. In terms of any specific exposure in Mr. Phelp's case, I can't testify to that. I'm not an environmental specialist." Dr. Orlowski also stated that he was unable to render an opinion in any definitive fashion as to the cause or contributing factor to the development of decedent's aplastic anemia.
10. Dr. Orlowski referred decedent to Dr. James Perry, who is also an expert in hematology and oncology, at North Carolina Baptist Hospital in Winston-Salem. At his deposition in response to a hypothetical question by plaintiff's counsel, Dr. Perry stated that long-term exposure to benzene could cause aplastic anemia and could have increased decedent's risk of contracting aplastic anemia. However, Dr. Perry was not able to state that the probability of a connection between benzene exposure and aplastic anemia was greater than 50%. Dr. Perry indicated that if decedent's exposure to benzene was sporadic and limited, the exposure was much less likely to have been a cause of decedent's aplastic anemia.
11. The greater weight of the expert medical evidence does not support a finding that decedent's job duties at defendant-employer caused or significantly contributed to his development of aplastic anemia or that his job duties exposed him to an increased risk of contracting aplastic anemia as compared to the general public not so equally exposed.
12. There is insufficient expert medical evidence to prove by the greater weight that exposure to Varsol resulted in decedent's death. Dr. Perry was unable to give an opinion whether there was more than 50% likelihood that decedent's death was related to Varsol exposure.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) the disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) the disease cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468;256 S.E.2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co., 79 N.C. App. 324,331, 339 S.E.2d 490, 494 (1986).
2. Plaintiff failed to prove that decedent's aplastic anemia was due to causes and conditions that are characteristic of and peculiar to a particular trade, occupation or employment. The greater weight of the medical testimony failed to causally relate decedent's development of aplastic anemia to his employment and failed to show that plaintiff was at an increased risk of contracting aplastic anemia because of his exposure to Varsol 18 during his employment with defendant-employer, as compared to the public not so exposed. N.C. Gen. Stat. § 97-53(13); Norris vs. DrexelHeritage Furnishings, Inc., 139 N.C. App. 620,534 S.E.2d 259 (2000).
3. Decedent did not contract a compensable occupational disease. Plaintiff is, therefore, not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for compensation for the occupational disease and death of decedent is HEREBY DENIED.
2. Defendants shall pay expert witness fees in the amounts of $310.00 to Dr. Orlowski and $465.00 to Dr. Perry.
3. Each side shall pay its own costs.
This 15th day of July, 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER