***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff contends that she sustained a compensable injury by accident or an occupational disease by inoculation on March 9, 2004. *Page 2 
2. At the time of the injury which is the subject of this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. At all times relevant to this claim, the employer-employee relationship existed between plaintiff and defendant-employer.
4. Key Risk Management Services, Inc., is the administrator of the claim.
5. Plaintiff's average weekly wage as of the date of her injury was $935.17, yielding a compensation rate of $623.48 per week.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 53 years old. Plaintiff is medical doctor and a native of China who was employed there doing investigative work regarding the pathology of the HIV virus. Her work came to the attention of American researchers who invited plaintiff to participate in HIV research at the University of North Carolina in Chapel Hill (hereinafter, UNC).
2. Plaintiff began working in the Gene Therapy Center at UNC where for approximately four years she did research and performed clinical trials. Thereafter, she spent approximately two years as a Research Analyst I in the Department of Microbiology and Immunology.
3. In order to investigate the HIV virus, researchers use the Venezuelan Equine Encephalitis virus (hereinafter, VEE), as it has physical properties similar to those of HIV and there exists a vaccination for VEE. As a prerequisite to her employment, plaintiff was required *Page 3 
to receive the VEE vaccination so that she could enter the laboratory in which the live VEE virus was housed.
4. The U.S. Military is in the process of testing the VEE virus vaccine on humans. The vaccine is in the experimental stages and is approved for use on human beings for research purposes only. Currently, the vaccine is in Phase II testing for safety and immunogenicity, which measures the development of antibodies in response to the vaccine.
5. Prior to working in the lab, plaintiff was required to undergo tests, including a hematology with complete blood count (cbc) and a differential platelet count, a normal biochemistry evaluation with electrolytes and liver function studies. In addition, a research analyst was required to have a normal negative HIV titer and a negative hepatitis C test. Finally, it was mandated that each participant undergo a urinalysis, EKG and a chest x-ray. Each research analyst was screened for VEE antibody titers to insure that he or she had not been exposed to the VEE virus in the past or that he or she has not previously received a vaccination.
6. Once a person receives the initial vaccination containing live VEE virus, the person's blood is evaluated for the presence of antibodies to the virus. If the antibody level is sufficiently high, no booster shot is required. If the antibody level is too low, a second inoculation is required. The vaccine used in the booster shot is supposed to be killed by formulin, but at least one study shows that humans may still become infected with the virus following a booster shot. The virus most often causes flu-like symptoms, but can cause serious illness or death in humans.
7. The results of plaintiff's tests did not reveal anything unusual. In addition, plaintiff tested negative for the VEE titer indicating that she had not previously been exposed to the VEE virus. *Page 4 
8. On September 16, 2003, plaintiff received the first of two scheduled vaccinations containing the live VEE virus at the U.S. Army Medical Research Institute of Infectious Disease (USAMRIID) at Fort Detrick, Maryland. Prior to receiving the vaccination, plaintiff had no history of infections or viral illness and was in good health.
9. Within two days of receiving the initial vaccine, plaintiff began to experience symptoms, including nausea, fever, headaches, fatigue and myalgia. The symptoms resolved within six days.
10. Plaintiff's titer level did not change following the first inoculation, indicating that her body had not mounted an immunological response to the vaccine. Accordingly, she was required to receive the booster shot. Plaintiff received the booster on March 9, 2004.
11. The day following the second inoculation, plaintiff immediately began to experience side effects similar to those which followed the first vaccine; however, the symptoms did not resolve. Plaintiff kept a detailed chart of her symptoms, including faintness, difficulty with balance and walking, fever, headache, rapid pulse, heart palpitations, muscle aches, cough, sore throat, runny nose, chills, diarrhea, shortness of breath and general weakness. Plaintiff's symptoms continued through September 2004.
12. Dr. Ellen Boudreau, chief of the USAMRIID special immunizations program, testified regarding plaintiff's participation in the program. Dr. Boudreau stated that approximately two thirds of those receiving the live virus vaccine experience side effects similar to those plaintiff experienced following the first inoculation and for a like period of time.
13. Regarding the second inoculation, Dr. Boudreau opined that testing on plaintiff on March 23, 2004 showed that her post-inoculation white blood cell count was about the same as her pre-inoculation count, indicating that there was no acute infection. She further noted that *Page 5 
there is only 15% to 17% incidence of side effects from the second type of vaccine, but usually the side effects are not as pronounced or prolonged.
14. After the onset of side effects following the second inoculation, plaintiff initially treated at UNC hospital where she was diagnosed with a viral upper respiratory tract infection. After her symptoms persisted for a period of time, plaintiff contacted Dr. Boudreau and was referred by her employer to the care of Dr. Robert Gwyther, a board-certified specialist in family medicine.
15. On April 16, 2004, plaintiff presented to Dr. Gwyther with complaints of myalgias, chills, headache, and nausea, which had been present since she received the booster shot for VEE in March 2004. Dr. Gwyther attributed plaintiff's condition as a reaction to the vaccine. Dr. Gwyther ordered a number of tests, recommended rest for plaintiff and wrote her out of work for one week.
16. Plaintiff returned to Dr. Gwyther on May 3, 2004. Her symptoms had improved somewhat. Plaintiff's tests had come back normal and Dr. Gwyther opined that the symptoms resulting from the VEE vaccine were tapering off. After consultation with Dr. Boudreau, plaintiff's supervisor and others, it was determined that plaintiff should cease working with VEE.
17. On June 2, 2004, plaintiff again presented to Dr. Gwyther with shortness of breath persisting since March 2004. Dr. Gwyther prescribed an inhaler and referred plaintiff to Dr. Wunian Chen to try a traditional Chinese medicine approach to her treatment.
18. On June 14, 2004, plaintiff presented to Dr. Chen for acupuncture treatment. Plaintiff received continuing traditional Chinese medical treatment from Dr. Chen and his partner, Dr. Remy Coeytaux, through September 2004. Based upon the temporal relationship *Page 6 
between the vaccine inoculation and the beginning of plaintiff's symptoms, Dr. Chen opined that there was a causal connection between the two.
19. Dr. Coeytaux noted that there was no way to prove the causal connection between the vaccine and plaintiff's symptoms, but again, based on the timing of the two, believed they were related. Dr. Coeytaux further opined that plaintiff's reaction to the vaccine could have in some manner compromised plaintiff's immuno-system, which in turn made her more susceptible to exposures that had not previously been bothersome. Dr. Coeytaux also opined that plaintiff's symptoms and their persistence may have been in part the result of her anxiety about being sick and having been exposed to the virus.
20. On June 16, 2004, plaintiff presented to internal medicine and pulmonary medicine expert Dr. Brian Boehlecke. Plaintiff had multiple complaints, including muscle aches, headaches, fever, nausea, fatigue; however, her chief complaint was shortness of breath with even minimal exertion. Dr. Boehlecke had plaintiff perform some tests which did not reveal any abnormality in plaintiff's oxygen saturation levels. Following the testing, his interviews with plaintiff and a review of the material submitted by Dr. Boudreau, Dr. Boehlecke opined that plaintiff's condition was not caused by the vaccine, but may have been psychological in origin. However, Dr. Boehlecke mistakenly believed that the types of symptoms that plaintiff had experienced following the second inoculation had not been observed by others.
21. Dr. Gwyther continued to treat plaintiff through September 14, 2004. By that visit, plaintiff was complaining only of a sore throat, and she attributed her improvement to the treatment provided by Drs. Chen and Coeytaux.
22. Following plaintiff's second inoculation in March 2004, her titer level rose to the point where she could be cleared to work in the laboratory housing the VEE virus. The initial *Page 7 
reason for plaintiff's inability to work in that lab was the prolonged duration of the symptoms of her illness. Thereafter, plaintiff's clearance to work in the lab was revoked due to her extended symptomology. Plaintiff attempted to return to work in December 2004; however, as she was not cleared to work in the laboratory housing the VEE virus, there was no available employment. On April 1, 2005, plaintiff accepted a position as a Research Technician III in the Lineberger Comprehensive Cancer Center.
23. Dr. Boudreau testified that the symptoms which plaintiff experienced are typical reactions to the inoculation, although it is normal for these symptoms to persist for a week at the most. Dr. Boudreau testified that she was not inclined to attribute plaintiff's condition to the vaccine since "it is totally out of the ordinary," as the vaccine has been administered to over 700 people in the last twenty years and no one has yet had a reaction of this type.
24. Dr. Gwyther, one of plaintiff's treating physicians, opined that plaintiff experienced symptoms following the second inoculation, and that the symptoms which lasted through the fall of 2004 were "the manifestation of anxiety resulting from the severity of the symptoms she experienced from the second inoculation." Dr. Gwyther testified that he believed plaintiff's account of her symptoms was accurate, "and were the direct result of her having experienced progressively more severe reactions to the VEE virus inoculations." The testimony of Dr. Gwyther, showed that plaintiff's anxiety resulted in the exacerbation of her symptoms.
Dr. Coeytaux testified that it was his medical opinion that plaintiff's symptomology was caused by the vaccination, based on numerous factors including plaintiff's account, the data available, and the plausibility of alternative explanations. Dr. Chen agreed with Drs. Gwyther and Coeytaux that plaintiff's symptoms were caused by the second inoculation and plaintiff's resulting anxiety. *Page 8 
25. The undersigned hereby find as fact that plaintiff's testimony regarding her symptoms following the second inoculation is credible.
26. The testimony of Drs. Gwyther, Coeytaux and Chen that plaintiff's symptoms were caused by the second inoculation are hereby given greater weight than the testimony of Drs. Boudreau and Boehlecke.
27. The greater weight of the medical evidence shows that the injections caused or significantly contributed to plaintiff's symptoms and resulting immunologic response. Plaintiff's treating physicians agreed that her symptoms were a typical response to the vaccination, but were more pronounced than had been seen in others. The greater weight of the evidence shows that plaintiff experienced stress and anxiety from the symptoms of the inoculation which contributed to the length and extent of her disability.
28. Plaintiff's employment with defendant-employer, particularly defendant-employer's requirement that plaintiff receive the VEE vaccination in order to enter the laboratory in which the live VEE virus was housed, caused or significantly contributed to the symptoms for which plaintiff was treated over the course of months following her second inoculation.
29. Plaintiff was placed at an increased risk over persons in the general population for these symptoms by virtue of her employment through participation in the government's experimental program studying the effects of the VEE virus.
30. Plaintiff missed work due to her occupational disease from March 11, 2004 until April 1, 2005.
31. As of April 1, 2005, plaintiff accepted a job as a Research Technician III in the Lineberger Comprehensive Cancer Center. Although plaintiff's new position earned slightly less *Page 9 
than her prior position, plaintiff has failed to show evidence of diminished wage earning capacity resulting from her compensable occupational disease.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) the disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) the disease cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468;256 S.E. 2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co., 79 N.C. App. 324, 331, 339 S.E. 2d 490, 494 (1986).
2. Plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease under N.C. Gen. Stat. § 97-53(13). This requires plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles,304 N.C. 44, 283 S.E.2d 101 (1981).
3. A disease is "characteristic" of the profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. Booker v. Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979). "Peculiar to the occupation" *Page 10 
as used in subdivision (13) of N.C. Gen. Stat. § 97-53, means that the conditions of the employment must result in a hazard that distinguishes it in character from the general run of occupations and is in excess of that employment in general. Keller v. City of Wilmington PoliceDept., 65 N.C. App. 675, 309 S.E.2d 543 (1983).
4. Plaintiff suffered a compensable occupational disease on or about March 9, 2004 as a result of the work she performed for defendant. N.C. Gen. Stat. § 97-53(13).
5. In order to show the existence of temporary total disability, plaintiff must present: (1) medical evidence that she is physically or mentally incapable of work in any employment; (2) evidence that she is capable of some work, but she has, after a reasonable effort on her part, been unsuccessful in her effort to obtain employment; or (3) evidence that she is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, lack of education, to seek other employment. Russell v. Lowe's Prod.Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 456 (1993). As plaintiff has provided medical evidence that she was physically incapable of work, plaintiff was disabled within the meaning of N.C. Gen. Stat. § 97-29 from March 11, 2004 until March 31, 2005.
6. Plaintiff is entitled to temporary total disability benefits at the rate of $623.48 during this period. N.C.Gen.Stat. § 97-29.
7. Plaintiff has failed to prove that she had diminished wage earning capacity as a result of her compensable occupational disease following her period of total disability, and is not entitled to temporary partial benefits pursuant to N.C.Gen.Stat. § 97-30.
8. Plaintiff is entitled to receive all past medical treatment received for her compensable occupational disease. N.C. Gen. Stat. § 97-25.
 *********** *Page 11 
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability benefits at the rate of $623.48 per week from March 11, 2004 until March 31, 2005, subject to the attorney fee approved herein.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of her compensable occupational disease reasonably designed to effect a cure, give relief, or lessen plaintiff's period of disability.
3. A reasonable attorney fee for plaintiff's counsel of twenty-five percent (25%) of the compensation due plaintiff under Paragraph 1 of this AWARD is approved and shall be paid directly to plaintiff's counsel.
4. Defendant shall pay costs.
This the 22nd day of January, 2007.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 12 
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER *Page 1