***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Upon conclusion of its review, the Full Commission affirms, with some modifications, the Opinion and Award of the Deputy Commissioner. *Page 2 
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, which has jurisdiction of the parties and of the subject matter. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. An employer-employee relationship existed between the plaintiff and defendant-employer at all relevant times herein.
3. Defendant-employer is an approved self-insured.
4. Plaintiff's average weekly wage was $1,106.08 per week, yielding a compensation rate of $704.00 per week, the maximum compensation rate for 2005.
5. Plaintiff timely filed an Industrial Commission Form 18, which was received by the Commission on February 1, 2006, alleging she sustained bilateral carpal tunnel syndrome as a result of her job duties with defendant-employer.
6. Defendant denied plaintiff's claim via an Industrial Commission Form 61, dated March 7, 2006.
7. The parties stipulated into evidence in this matter Stipulated Exhibits 1, 2 and 3, which consist respectively of the Industrial Commission forms in this matter, plaintiff's medical records and defendant's health records.
8. In addition, the following were admitted into evidence: *Page 3 
 • Plaintiff's Exhibits numbered 1 through 4
(Plaintiff's exhibit #1 is plaintiff's work history, #2 and #3 are plaintiff's jobs with Tultex, and #4 is instructional material created by plaintiff while working for defendant-employer).
 • Defendants' Exhibits 1 through 5 (Defendant's exhibits 1, 2, 3 and 4 are plaintiff's performance evaluations, and #5 is the job description for the Senior Training Engineer).
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Diane Duffy worked at Tultex Corporation from 1974 to 2000 in the following positions:
 a. Sewing Machine Operator in production from 1974-1981 and from 1988-1991;
 b. Sewing Machine Operator in the Sample Department from 1981-1988 and from 1991-1993; and
 c. Sewing Instructor from 1993-2000.
2. While employed at Tultex in production, plaintiff consistently made over 100% of production goals.
3. As an example of her work as a Sewing Machine Operator in production at Tultex, plaintiff sewed the hem and leg elastic on adult track pants after 1988. Plaintiff met 100% of production goals, which involved sewing 5,112 pant legs on each shift. For each leg, plaintiff was required to pinch the fabric twice with the left hand; to pinch and hold the fabric *Page 4 
continuously with the right hand; then to pinch once with the left hand and cut with scissors the elastic between each leg to separate the pieces.
4. The total for 100% of production per shift was:
 a. 15,336 pinches with the left hand;
 b. 5,112 continuous pinches with the right hand; and
 c. 5,112 scissor clips with the right hand.
Plaintiff sewed at about 150% of production or 7,668 legs per shift, which would increase the above numbers by 50%.
5. As another example of her work, plaintiff also sewed the hem waist elastic for adult track pants after 1988. She met 100% of production goals, which involved sewing of 2,148 waistbands on each shift. For each waistband, plaintiff was required to pinch the fabric five times with the left hand; to fold, pinch and grip the fabric with the right hand; and to cut with scissors the elastic band between the pieces once.
6. The total for 100% of production per shift was:
 a. 10,740 pinches with the left hand;
 b. 2,148 continuous gripping pinches with the right hand; and
 c. 2,148 scissor clips with the right hand.
Plaintiff exceeded production on this job.
7. As another example of her work, plaintiff also sewed an elastic one-step waistband on adult track pants from 1988 to 1991. She met 100% of production goals that involved sewing 852 one-step elastic waistbands per shift. For each waistband, plaintiff was required to pinch the elastic with her right and left hands and stretch the elastic and load it on the machine, using a curvy motion with her left hand to reach around the sewing machine and place *Page 5 
elastic on the back of the machine. She then pinched the fabric with her right and her left hands. She pinched and pulled with her right hand to hold fabric in place. With her left hand, she pinched and fed the fabric into the sewing machine, pulled it around, and down to get it into the folder. She then pinched continuously with her right hand to hold the fabric and pinched the fabric four times with her left hand to guide it as it advanced through the sewing machine.
8. The total for 100% of production per shift was as follows:
 a. 5,112 pinches with the left hand, including pinching and pulling on the elastic;
 b. 1,704 pinches with her right hand, including pinching and pulling on the elastic and continuous pinching of the cloth; and
 c. Rotation, flexing and extending of the wrist to place the elastic on the machine and guide the cloth through the machine.
Plaintiff sewed at about 110% of production, which would increase the above numbers by 10%.
9. Plaintiff also sewed the leg elastic onto adult track pants from 1988-1991. She met 100% of production goals that involved the sewing of 4,416 legs per shift. For this task, plaintiff sewed a little above production. For each leg, plaintiff was required to pinch the fabric three times with her left hand; to pinch and stretch the elastic attached to the fabric continuously with her right hand; and to cut with her scissors each piece apart from the others.
10. The total for 100% of production per shift was as follows:
 a. 13,248 pinches with her left hand;
 b. 4,416 pinches with her right hand while stretching back the elastic; and
 c. 4,416 scissor clips with her right hand. *Page 6 
11. The entire time plaintiff sewed at Tultex she used her hands continuously, both extending and flexing them.
12. As a sewing instructor from 1993 through January 2000, plaintiff's duties were to teach sewing machine operators. While teaching, plaintiff operated a sewing machine approximately 50% of her time at one plant in Roanoke, Virginia, and somewhat less than 50% at other plants. She sewed slower than production in the beginning and then accelerated as her students' skill improved.
13. From January 2000 to June 2005, plaintiff worked as a Training Technical Engineer for defendant-employer. In this position, plaintiff traveled outside the United States between two to three weeks per month training employees in textile factories in Mexico and other countries. Her duties included setting up sewing machines and training operators.
14. Early in her employment with defendant-employer from 2000 to 2001, she spent most of her time setting up and training on the one-step waistband machine (as described in paragraph 7 above) at plants in Mexico. Training activities included repeatedly demonstrating the same sewing procedures, slowly and at full production speed, until the trainees were proficient. During these trips, plaintiff would spend 10 to 12 hours a day working with the machines and operators. She would operate the sewing machine from 25% to 50% of the time she was in the plants.
15. When plaintiff was not training in another country, she worked in Winston-Salem, where she sewed approximately 25% of the time. Plaintiff commuted from her home in Moneta, Virginia to defendant-employer's facilities in Winston-Salem, North Carolina, approximately two hours each way. In addition to sewing, plaintiff was involved in cutting and developing *Page 7 
patterns for garments, as well as writing and illustrating new sewing instruction guides for new patterns and products.
16. After working for approximately one year setting up and training on the one-step waistband machine, plaintiff noticed problems with her hands, including numbness in her fingers, the feeling of an electric shock going up her arm, a weakened grip, and waking up at night with her hands asleep. Plaintiff's hands improved when she was not working on the one-step waistband machine and when she was sewing lighter fabric and different styles.
17. In September 2002, plaintiff was in a motor vehicle accident when she was driving a car that rear-ended another vehicle. Plaintiff was treated for neck and back strain and was treated for back pain through February 2003. All her imaging films were negative.
18. While employed by defendant-employer, plaintiff spent between 25% and 35% of her time at the sewing machine, demonstrating techniques for speed and accuracy and developing new methods.
19. Plaintiff's duties also involved the fine adjustment of sewing machines using tweezers, Allen keys and small wrenches. Plaintiff had a personal set of hand tools that she constantly used to fine-tune the sewing machines. Additionally, plaintiff's duties included the ripping out of seams of garments that were not first quality with a small hand tool.
20. While plaintiff was working with the one-step waistband machine in 2004, her hands again bothered her with numbness and tingling in her fingers. Plaintiff also worked on a zipper-leg pant, which involved topstitching a zipper. The zipper had to be held between the thumb and index finger, twisted and folded under the fabric and forced to the right to make the fabric and zipper go under the presser foot. The top stitched zipper was stressful on her hands because it was thick and had to be twisted and forced into the machine. On October 27, 2004, *Page 8 
plaintiff first reported her hand problems to her family physician, Dr. Virginia Blanks and again on June 14, 2005.
21. On June 15, 2005, plaintiff underwent a nerve conduction test. On June 18, 2005, Dr. Blanks released plaintiff from work for carpal tunnel syndrome and referred her to Roanoke Orthopaedic Center for treatment.
22. On September 1, 2005, plaintiff presented to Dr. Hugh Hagan, an orthopedic surgeon in Roanoke, Virginia, who opined, "she has distorted 2-point discrimination in the left hand, thumb and index at about 8 mm, 4mm elsewhere and 4mm to 5mm in the right hand. Positive percussion signs over both median nerves. Positive Phalen signs within 30 seconds in the mediation distribution." Dr. Hagan further opined, "My impression is that she has by history, by physical exam and by electrical diagnostic studies bilateral carpal tunnel syndrome with some loss of sensibility in the left hand."
23. On October 5, 2005, Dr. Hagan performed a left hand carpal tunnel release at the Roanoke Ambulatory Surgery Center. On October 12, 2005, plaintiff followed up with Dr. Hagan, who opined, "My impression is that she is doing okay but she is having some stiffness and pain. It is going to keep her from being able to get back to work . . . I am going to keep her off work until we see her back on November 14, 2005." Dr. Hagan recommended that she continue hand therapy and that the carpal tunnel release for the right hand be delayed.
24. On December 10, 2005, plaintiff again presented to Dr. Hagan, who continued plaintiff's work restriction until her next visit. At plaintiff's February 6, 2006 visit with Dr. Hagan, he noted that her left hand wound was completely healed, but that her right hand showed positive Phalen's and percussion signs. Regarding plaintiff's ability to work, he stated, "Her *Page 9 
current work status is restricted to no work. I am going to put an indefinite stop on her work for now until we see how she responds to the surgery on the right hand."
25. On April 21, 2006, plaintiff underwent a right carpal tunnel release surgery performed by Dr. Hagan at the Roanoke Ambulatory Surgery Center. In his May 5, 2006 office note, Dr. Hagan stated, "I am going to keep her off work indefinitely. I just cannot imagine seeing her go back to work at this state."
26. On May 31, 2006, plaintiff presented to Dr. Hagan, who again opined that plaintiff was unable to work. In addition, he indicated that her work restriction would be indefinite, "as with her current pain and guarding, I cannot imagine she could be productive with either hand."
27. After examining plaintiff on July 28, 2006, Dr. Hagan stated that plaintiff had unremitting upper extremity pain, though all of her physical findings associated with her carpal tunnel have been relieved by surgery. At this visit, Dr. Hagan opined that he did not anticipate plaintiff returning to any kind of heavy or repetitive labor with her hands and he removed her from work indefinitely. When plaintiff presented to Dr. Hagan again on October 27, 2006, she complained of "continued residual weakness, generalized aching pain in both of her hands and over the lateral aspects of both of her elbows.
28. At his deposition on August 14, 2007, Dr. Hagan opined that plaintiff suffered from bilateral carpal tunnel syndrome; that her 30 years of employment as a sewing machine operator and sewing instructor was a causal factor in the development of that carpal tunnel syndrome; that her 30 years of employment as a sewing machine operator and sewing instructor placed her at greater risk of the development of carpal tunnel syndrome than members of the *Page 10 
public generally; and that her employment with defendant-employer was the last injurious exposure to the hazards of the disease of carpal tunnel syndrome.
29. At his deposition on August 8, 2007, defendant's expert, Dr. Forney Hutchinson, an orthopedic surgeon opined that plaintiff's employment with defendant-employer did not cause or was not a contributing factor to her carpal tunnel syndrome because "this type of work does not cause the development of carpal tunnel syndrome." Dr. Hutchinson has neither examined nor treated plaintiff. The Full Commission gives greater weight to the testimony of Dr. Hagan, plaintiff's treating orthopedic surgeon, than to that of Dr. Hutchinson, who rendered his opinions based solely on a medical records review.
30. As Dr. Hagan was unsure why plaintiff continued to have problems with her hands and arms, he recommended plaintiff be seen by a rheumatologist to determine the causes of plaintiff's problems and whether they are related to her compensable injury.
31. Plaintiff received short-term disability at her regular salary for six months in the total amount of $25,166.06 from defendant-employer. The plan was fully funded by defendant-employer.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) the disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) the disease cannot be an *Page 11 
"ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468;256 S.E. 2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co., 79 N.C. App. 324, 331, 339 S.E. 2d 490, 494 (1986).
2. In the present case, plaintiff has carried the burden of proof to establish that her employment for defendant-employer caused or significantly contributed to the development of the occupational disease of bilateral carpal tunnel syndrome and that her employment with defendant-employer placed her at an increased risk of developing this condition compared to the general public. N.C. Gen. Stat. § 97-53(13).
3. As a direct and proximate result of plaintiff's compensable occupational disease of carpal tunnel syndrome, plaintiff was unable to earn any wages from June 18, 2005 and continuing and thus is entitled to temporary total disability compensation at the rate of $704.00 per week. N.C. Gen. Stat. §§ 97-2(9); 97-29.
4. Plaintiff is entitled to have defendant provide such medical care and treatment as is reasonably required to provide relief, effect a cure or lessen plaintiff's period of disability caused by her compensable occupational disease, including but not limited to a referral to a rheumatologist to determine whether plaintiff's continuing problems are related to her compensable injury. N.C. Gen. Stat. §§ 97-2(19); 97-25.
5. Defendant is entitled to a credit for the benefits paid plaintiff through its fully funded short-term disability plan. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following: *Page 12 
 AWARD
1. Subject to attorney's fees approved herein, defendant shall pay to plaintiff temporary total disability compensation from June 18, 2005 and continuing in the amount of $704.00 per week. Since this amount has accrued, it shall be paid in a lump sum, subject to an attorney's fee. Defendants are entitled to a credit for short-term disability.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff for treatment of plaintiff's occupational disease of carpal tunnel syndrome for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or lessen plaintiff's period of disability, including but not limited to a referral to a rheumatologist to determine whether plaintiff's continuing problems are related to her compensable injury.
3. A reasonable attorney's fee in the amount of twenty-five (25%) percent of the accrued benefits due under Paragraph 1 of this Award is hereby approved for plaintiff's counsel, which shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the ___ day of July 2008.
S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/_______________ BUCK LATTIMORE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER *Page 1