***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence, receive further evidence, or rehear the parties and their representatives. Accordingly, the Full Commission REVERSES the Opinion and Award of Deputy Commissioner Rowell and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. The date of the alleged injury or occupational disease that is the subject of this claim is February 23, 2007, although the evidence may show a different onset date for purposes of an occupational disease claim.
2. At all relevant times, the parties hereto were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. At all relevant times, Defendant-Employer regularly employed three (3) or more employees in the State of North Carolina.
4. At all relevant times, the administrator of workers' compensation insurance in North Carolina for the self-insured Defendant-Employer was Specialty Risk Services.
5. The North Carolina Industrial Commission has jurisdiction over the subject matter and parties involved in this case.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is fifty years old and went to community college for several years, where he received certifications for home inspection and real estate.
2. Since January 3, 1994, Plaintiff has worked for Defendant-Employer as a sales route representative. This job required Plaintiff to load and deliver clean uniforms, mats, towels, and other industrial supplies to customers on a route, and also to pick up dirty supplies from those customers to bring them back to Defendant-Employer for cleaning. Plaintiff serviced the same customers on a weekly schedule and drove a 24-foot company truck or van on his route. *Page 3 
3. Plaintiff's job consisted of ten essential functions that he performed on a daily basis. He had performed these functions during his fourteen-year tenure with Defendant-Employer.
4. First, Plaintiff had to inspect his truck by raising the hood, checking the oil and fuel levels, and checking the tires. Plaintiff had to stoop and kneel, and once or twice a week he had to reach with his arms at 90-degree angles or more while doing this function.
5. Second, Plaintiff had to move carts filled with industrial supplies after unloading the clean supplies for a customer and loading the dirty supplies from the customer. Most of the time, Plaintiff used a grocery cart to transport these items to and from a customer's place of business to his truck.
6. To load and unload these supplies, Plaintiff first started using metal "cages" to store them in the back of his truck in late 2006, when he was assigned the Harris Teeter account. The cages were about five feet by three and a half feet in size with an opening at the top around two-and-one-half to three-feet so that Plaintiff could lift and drop industrial supplies back into the cages. Plaintiff used his arms to lift these supplies out of the cages and carts, and he had to turn around to place the supplies either into the carts or back into the truck and cages, depending on whether he was loading or unloading. For example, Plaintiff serviced several Harris Teeter grocery stores per day, and Plaintiff removed and replenished floor mats at each customer store of various sizes and weighing between fourteen and nineteen pounds each. Plaintiff lifted two or three and occasionally up to four floor mats at a time, and he normally turned and tossed them to move them towards the carts or into the van. Plaintiff worked on ground level near the grocery carts around thirty percent of the time, and seventy percent of that time he was using his arms at *Page 4 
angles of ninety degrees or more while pitching the mat from a low level to a high level compared to his body.
7. Third, Plaintiff had to lift the industrial supplies, including the floor mats, shop towels, roll towels, bar towels, dust mops, and uniforms to put them into the cart to transport back to his truck. The towels were bagged or bundled and weighed around twenty-eight pounds per bundle when clean, but forty pounds per bundle when dirty. Plaintiff lifted the bundles of towels above shoulder level up to thirty percent of the time, and the remaining time he dragged the bundles or bags to the carts so that he could then bring the towels to his truck. To lift the bundles into the cart, Plaintiff had to use his arms at angles of ninety degrees or more.
8. To lift some items, Plaintiff had to use over the shoulder force by carrying bundled items while they were suspended on hangers or poles. Plaintiff tried to keep the total load on these poles around fifty pounds, and he had to lift industrial supplies in this fashion between twelve and fifteen times during an average work day.
9. Fourth, Plaintiff had to lift the same industrial supplies out of the cart in order to put them into his truck. These were dirty supplies, which normally weighed more than the clean supplies that Plaintiff was delivering. For example, around twenty-five percent of the mats that Plaintiff serviced at Harris Teeter stores, as well as several other customers, were waterlogged and weighed considerably more than non-waterlogged mats. Plaintiff always carried between two and four mats at a time above shoulder level, and tried to keep the total weight around forty pounds. When lifting bags of towels, on the other hand, Plaintiff's arms were occasionally above shoulder level.
10. Fifth, Plaintiff had to drive his truck from customer to customer. *Page 5 
11. Sixth, Plaintiff had to deliver merchandise to each customer by carrying multiple items of industrial supplies up to 150 feet. These supplies weighed up to seventy-five pounds. Plaintiff used his arms above shoulder level at least thirty percent of the time while performing this function.
12. Seventh, Plaintiff had to pick up dirty supplies at each customer's location. In doing so, he used his arms above shoulder level between thirty and forty percent of the time while lifting up to one hundred pounds of industrial supplies.
13. Eighth, Plaintiff had to sort or bundle the different supplies that he picked up from customers. This was typically, but not always, done at the floor level, and Plaintiff used his arms above shoulder level only "occasionally" during this function.
14. Ninth and tenth, Plaintiff had to complete paperwork after servicing each customer and had to complete his entire route of customers each day before returning to Defendant-Employer. It took Plaintiff between ten to twelve hours a day to complete his route.
15. Plaintiff serviced twenty-two or twenty three customers on his route in an average day, and he had to perform each of the previous job functions for every customer. Plaintiff serviced eight Harris Teeter stores per day (with each store having twenty-five mats), a concrete company, auto shops, three or four restaurants, and other grocery stores.
16. Defendant-Employer's written job description of Plaintiff's job confirms that Plaintiff had to use his arms to reach above shoulder level on an "occasional" basis, which means up to 33% of an eight-hour work day.
17. At approximately 2:30 pm on February 23, 2007, Plaintiff experienced pain in his right shoulder while lifting mats at a Harris Teeter store. Plaintiff was loading carts while standing on the bumper on the back of his truck, reaching around behind him with his right arm *Page 6 
to grab the mats and holding onto a cage in the truck with his left hand. Plaintiff is left-handed. The motion he used to lift the mats with his right hand started out by pulling mats below the level at which Plaintiff was standing, and it ended up with his right arm reaching at an angle exceeding ninety degrees. Plaintiff had never experienced pain in his right shoulder before February 23, 2007. He hoped the pain in his shoulder was temporary and that it would go away.
18. Plaintiff's route on February 23, 2007, ended at approximately 3:30 or 4:00 pm.
19. The mats that Plaintiff was lifting on February 23, 2007, were much heavier than usual, even though he had been working with Harris Teeter mats for five or six months prior.
20. For reasons unrelated to his shoulder condition, Plaintiff did not work on Saturday, February 24, 2007 or on Sunday, February 25, 2007.
21. Plaintiff filed a written report of an accident or injury with Defendant-Employer on Monday, February 26, 2007. However, Defendant-Employer did not send him to a doctor until March 7, 2007, largely because Plaintiff thought he would get over his shoulder pain. Plaintiff has consistently reported that he injured his right shoulder while lifting mats on February 23, 2007. Defendant-Employer indicated to Defendant-Carrier that it had no reason to doubt Plaintiff's claim.
22. On March 7, 2007, Plaintiff went to Concentra Medical Center, where Dr. Margaret Grossman restricted him to lifting no more than ten pounds, no pushing or pulling greater than ten pounds, and no reaching above the shoulder. His diagnosis was a right rotator cuff strain. At this and all subsequent examinations at Concentra, Plaintiff demonstrated a positive impingement sign in his right shoulder on physical examination.
23. On March 9, 2009, Dr. Pietro of Concentra Medical Centers diagnosed Plaintiff with rotator cuff strain, shoulder impingement, and possible rotator cuff tear. *Page 7 
24. Despite having medical restrictions, Plaintiff continued to work for Defendant-Employer between February 23, 2007, and September 12, 2007.
25. On April 5, 2007, Plaintiff reported to Dr. Neal Powell with Carolina Orthopaedic Surgery Associates complaining of right shoulder pain which began on February 23, 2007 when lifting a heavy object at work. Dr. Powell diagnosed Plaintiff with right shoulder pain with possible rotator cuff tear.
26. On April 16, 2007, Plaintiff underwent an MRI which revealed a partial rotator cuff tear with a posterior SLAP lesion. On April 24, 2007, Dr. Powell wrote a letter to Plaintiff indicating that the MRI revealed a partial tear of the rotator cuff and a partial detachment of the lip surrounding the socket.
27. On September 12, 2007 Dr. Powell performed an arthroscopic debridement and synovectomy with labral debridement, arthroscopic subacromial decompression, and a mini rotator cuff repair, all on Plaintiff's right shoulder. Plaintiff's postoperative diagnoses were chronic right partial rotator cuff tear, superior labral fraying of the right shoulder, and synovitis. Dr. Powell also noted marked subacromial bursitis. This was the first point in time that the medical records indicate the presence of diagnoses that are specifically enumerated in N.C. Gen. Stat. § 97-53.
28. The rotator cuff is a complex of four different tendons and was associated with inflammation of the synovium in Plaintiff's shoulder, otherwise known as synovitis or tenosynovitis, as well as the inflammation of Plaintiff's bursa. Plaintiff's frayed labrum indicated chronic or wear and tear damage (as opposed to an acute injury). Although Plaintiff first reported experiencing pain on February 23, 2007, Dr. Powell testified that the postoperative findings were chronic, pre-existing findings. *Page 8 
29. Based upon the testimony of Dr. Powell and the greater weight of the credible evidence the Full Commission finds that Plaintiff's job activities placed him at an increased risk of contracting shoulder problems for which Dr. Powell treated Plaintiff.
30. Based upon the greater weight of the evidence, the Full Commission finds that Plaintiff's job activities were sufficiently traumatic on Plaintiff's shoulders and put intermittent pressure on his shoulders. The Full Commission further finds based upon the testimony of Dr. Powell and the greater weight of the credible evidence that Plaintiff's job duties and activities including the activities on February 23, 2007 were the likely cause of or significantly contributed to Plaintiff's shoulder condition for which he was treated by Dr. Powell.
31. As the result of his shoulder conditions, including his rotator cuff tear, labral fraying, synovitis, and bursitis, Plaintiff was medically unable to perform any work between September 12, 2007, and January 28, 2008.
32. September 12, 2007, was the first date on which Plaintiff both(1) was disabled and (2) had been diagnosed by Dr. Powell, who is a competent medical authority, that he had occupational diseases that were specifically enumerated in N.C. Gen. Stat. § 97-53. Even though he was unable to appreciate the different legal concepts of an "injury" versus an "occupational disease," Plaintiff knew that his shoulder condition was work-related at the time this condition was accurately diagnosed during surgery on September 12, 2007.
33. Plaintiff was last injuriously exposed to the risks of contracting his shoulder diagnoses from his work activities at Defendant-Employer.
34. Effective January 28, 2008, Plaintiff had reached maximum medical improvement, and Dr. Powell restricted Plaintiff to work avoiding significant heavy lifting. *Page 9 
35. Upon receiving Dr. Powell's restrictions, Plaintiff immediately drove to Defendant-Employer to inquire about returning to work. Defendant-Employer would not let Plaintiff return until he settled his workers' compensation claim, which at that time was denied by Defendant-Employer and still in dispute. Plaintiff involved his labor union at this point, and through his efforts, returned to work with Defendant-Employer in his usual job earning his pre-injury average weekly wages on February 18, 2008.
36. Between January 29, 2008, and February 18, 2008, Plaintiff made a reasonable effort to return to work, but without success.
37. Plaintiff received short-term disability benefits after September 12, 2007, but was obligated under an agreement to reimburse or subrogate the short-term disability carrier for any workers' compensation payments subsequently made for the same period. Defendants did not introduce a copy of the plan document for the short-term disability carrier, and did not introduce evidence of who paid its premiums or whether the short-term disability carrier was an ERISA carrier protected by federal law.
38. Plaintiff has a permanent partial disability rating of 10% to his right arm as a consequence of his shoulder condition.
39. Although the testimony of the two medical experts in this case was fairly consistent with each other, to the extent that the testimony is inconsistent, the Commission gives greater weight to the testimony and opinions of Dr. Neal Powell as he is a qualified orthopedic surgeon who actually performed the surgery on Plaintiff's shoulder and confirmed the diagnoses.
40. The Full Commission finds that it is not able to fairly determine Plaintiff's average weekly wage based upon the Form 22 submitted by the parties.
 *********** *Page 10 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff is not required to elect an "injury" theory over an "occupational disease" theory, or vice versa, in this case. SeeHamby v. PPG Indus., 154 N.C. App. 311, 571 S.E.2d 853 (2002).
2. The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co.,79 N.C. App. 324, 331, 339 S.E. 2d 490, 494 (1986). Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13) if two conditions are met: (1) the disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) the disease cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v.Medical Center, 297 N.C. 458, 468; 256 S.E. 2d 189, 196 (1979). Plaintiff has shown that his job with Defendant placed him at an increased risk developing a rotator cuff tear and that his job either caused or significantly contributed to his development of a rotator cuff tear. Id. Therefore, Plaintiff's rotator cuff tear is a compensable occupational disease under N.C. Gen. Stat. § 97-53(13).
3. In addition Plaintiff has shown that his diagnoses of bursitis and synovitis were caused by or significantly contributed to by his job duties with Defendant and are compensable occupational diseases under N.C. Gen. Stat. §§ 97-53(17) and 97-53(20). *Page 11 
4. Between September 12, 2007 and February 19, 2008, Plaintiff was totally disabled. N.C. Gen. Stat. §§ 97-2(9); 97-29. Therefore, Plaintiff is entitled to temporary total disability benefits from September 12, 2007 through February 19, 2008.
5. Plaintiff is entitled to compensation for a 10% permanent partial disability to his right arm under N.C. Gen. Stat. § 97-31(13).
6. Defendants are not entitled to a credit against compensation payable for the short-term disability payments received by Plaintiff. N.C. Gen. Stat. § 97-42.
7. During his employment with Defendant-Employer, Plaintiff was last injuriously exposed to the work hazards and risks associated with the shoulder conditions with which he has been diagnosed. N.C. Gen. Stat. § 97-57.
8. Defendants are liable for all injury-related medical compensation provided to Plaintiff, including the treatment and services provided by Plaintiff's treating surgeon, Dr. Powell and Dr. DePietro. N.C. Gen. Stat. § 97-25.
9. Defendants shall reimburse any group health insurance carrier in accordance with N.C. Gen. Stat. § 97-90.1, so that Plaintiff and his medical doctors are paid through workers' compensation and made whole.
10. Based upon the Form 22 submitted by the parties, the Full Commission is not able to fairly determine Plaintiff's average weekly wage. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD *Page 12 
1. Subject to the attorneys' fee in paragraph 3 below, Defendants shall pay temporary total disability compensation to Plaintiff for each week between September 12, 2007 and February 19, 2008.
2. Subject to the attorneys' fee in paragraph 3 below, Defendants shall pay 24 weeks of permanent partial disability compensation to Plaintiff (10% PPD x 240 weeks).
3. Plaintiff's counsel is entitled to a reasonable attorneys' fee of 25% of the compensation awarded in this Opinion and Award.
4. All accrued amounts of compensation and fees shall be paid to Plaintiff in a lump sum subject to attorney's fees.
5. In order for the Full Commission to fairly determine Plaintiff's average weekly wage, the parties shall within 15 days of the filing of this Opinion and Award either stipulate to Plaintiff's average weekly wage or submit a completed Form 22 for the period of September 12, 2006 through September 12, 2007.
6. Defendants shall pay for medical compensation as specified in this Opinion and Award.
7. Defendants shall pay the costs.
This the 9th day of December 2009.
S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING: *Page 13 
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1